Nikitas **AMORGIANOS** and Donna **Amorgianos**, Plaintiffs,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION d/b/a Amtrak,** Defendant.

No. CIV A. CV–96–2745 (DGT).

United States District Court, E.D. New York.

March 29, 2001.

As Corrected April 16, 2001.

Lawrence P. Biondi, New York City, for plaintiffs.

Angela D. Vitali, Parker Chapin Flattau & Klimpl, New York City, for defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff Nikitas Amorgianos ("Mr. Amorgianos") brought this action against the National Railroad Passenger Corporation ("Amtrak") for personal injuries allegedly suffered as a result of workplace exposure to xylene. Plaintiff Donna Amorgianos ("Mrs. Amorgianos"), his wife, joined in the action, claiming loss of consortium and services. After a jury trial and a verdict rendered in favor of plaintiffs, Amtrak moved for a judgment as a matter of law or, in the alternative, for a new trial. The court denied defendant's motion for judgment as a matter of law, but granted defendant's motion for a new trial, finding that the jury's verdict was against the weight of the evidence. Amtrak now moves to preclude plaintiffs' experts from testifying at retrial on the ground that their testimony does not meet the standard for admissibility under Federal Rule of Evidence 702 set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and its progeny.

### Background

Mr. Amorgianos is a forty-six year old man, who, until the time of the alleged accident giving rise to this action, had worked as a bridge painter since 1974. (Tr. 6/17/98, at 37–38.) Mr. Amorgianos, his wife, and his treating physician, Dr. Jacqueline Moline ("Dr. Moline"), all testified at trial that Mr. Amorgianos had been healthy prior to the incidents in question here. (Tr. 6/17/98, at 95, 129; Tr. 6/18/98, at 132.)

## (1)

### The Steinway Street Bridge Project

On July 22, 1995, Mr. Amorgianos began working with a crew of painters employed by Romano Enterprises ("Romano"), which, along with two other painting companies, had been contracted to repaint the Steinway Street Bridge in Astoria, Queens (the "Steinway Street Bridge Project" or the "Project"). (Def.'s Letter Brief of 12/6/99, Ex. K; Tr. 6/24/98, at 40.) The Steinway Street Bridge is a street overpass for a rail line operated by defendant Amtrak. The bridge consists of three piers and two 120–foot spans; one span passes over Steinway Street, and the other passes over Twenty–Third Street. (Def.'s Letter Brief of 12/6/99, Ex. L.)

The operation involved five steps: sandblasting off the old paint; applying a primer coat; applying a white, intermediate coat; applying a red, pigmented coat; and applying an anti-graffiti top coat to the portions of the bridge visible to pedestrians. (Tr. 6/17/98, at 50; Tr. 6/24/98, at 48–49.) Different steps in this process were performed on different sections of the bridge simultaneously. (Tr. 6/24/98, at 31–33.) For instance, while one group of workers was sandblasting part of one span, another group might have been applying primer to a section of the other span.

Because the old paint was lead-based, it was necessary to enclose whichever particular section was being sandblasted in order to protect pedestrians from exposure to lead paint dust blown off the bridge. (Tr. 6/24/98, at 50.) For this purpose, a box-shaped containment consisting of tarpaulins which were fastened together was erected around the affected section of the bridge and its supporting undercarriage during the sandblasting operation. (Tr. 6/17/98, at 42, 44.) At trial, Mr. Amorgianos testified that the containment was approximately 75 to 100 feet long, (id. at 41.);

Ralph P. Romano, a co-owner of Romano Enterprises, testified that it was about 100 feet long, (Tr. 6/24/98, at 47). Mr. Romano further testified that the containment was about 15 to 18 feet high and 50 feet wide, (Tr. 6/24/28, at 47).

The containment was fitted with a vacuum hose on one end to carry lead paint dust out of the interior space and into a dust collector. (Tr. 6/17/98, at 42.) There were two louvers on the wall of the containment opposite from the dust collector intake. The louvers could be opened or closed as needed to introduce fresh air into the containment and to facilitate the flow of air through it. (Id. at 44; Tr. 6/24/98, at 50–51.)

The same type of containment was used during the spray-painting phases of the operation in order to keep paint overspray from falling on pedestrians and the surrounding area. (Tr. 6/24/98, at 50.)

Romano time records indicate that Mr. Amorgianos began working on the Steinway Street Bridge Project on July 22, 1995, and continued on the job until his alleged accident on August 28, 1995. (Def.'s Letter Brief of 12/6/99, Ex. K.)

## (2)

### Plaintiffs' Claims

The gravamen of plaintiffs' complaint is that Mr. Amorgianos was not provided with the appropriate personal protective gear, the containment was not properly ventilated, and, as a result, he was exposed to dangerous concentrations of paint fumes while spray-painting inside the containment. Exposure to organic solvent vapors in the paint fumes, particularly xylene vapor, he contends, caused him to develop permanently disabling (1) central nervous system ("CNS") dysfunctions, such as memory loss, cognitive deficits, and changes in affect, and (2) peripheral polyneuropathy ("PN"), a neurological condi-

tion involving the loss of sensation and motor control in the extremities.[1]

Specifically, plaintiffs contend that proper industrial hygienic practice is to provide a spray-painter who is working inside an enclosed space with a respirator containing a filter specially designed for organic solvent vapors. According to plaintiffs, these filters must be changed on a daily basis, or they become ineffective. Mr. Amorgianos alleges that Romano failed to provide him with an adequate supply of fresh organic vapor filters. In addition, plaintiffs contend that proper industrial hygienic practice would have been to turn the dust collector on and open the fresh air vents during spray-painting; Mr. Amorgianos alleges that this was not done on the Steinway Street Bridge Project. Plaintiffs also assert that a fan should have been placed inside the containment to increase air flow further. Plaintiffs contend that the failure to provide adequate air flow through the containment allowed dangerous levels of organic solvent vapors to accumulate within the containment, exacerbating the danger posed to Mr. Amorgianos by defendant's alleged failure to provide him with the appropriate filters for his respirator.

On the afternoon of August 28, 1995, Mr. Amorgianos became acutely ill allegedly due to his exposure to the paint fumes, left work, and has allegedly suffered disabling CNS deficits and PN since that date, with no improvement over time.

As detailed below, the various expert and non-expert factual issues raised by plaintiffs' claims were contested at trial.

(3)

### The Evidence at Trial

Plaintiffs' action came for jury trial before the Honorable Edward R. Korman of this Court (the "trial judge") in June, 1998.

### A. Personal Protective Gear Provided to Mr. Amorgianos

#### 1. Plaintiffs' Evidence

When Mr. Amorgianos started on the Project, he was provided with a half-face respirator mask. (Tr. 6/17/98, at 58–60.) The respirator could be fitted with a lead dust filter and/or with a filter for organic vapors. (*Id.* at 59–60, 62.) The lead dust filter was to be used during sandblasting, while organic vapor filters were to be used during spray-painting. (*Id.*) Mr. Amorgianos testified that at certain times during his work on the Project, he sandblasted, and at other times, he spray-painted; both activities were performed inside the containment. (*Id.* at 59–61.)

While sandblasting, Mr. Amorgianos was also provided with a cloth hood, which covered his head and uniform. (*Id.* at 45.) The hood was connected to a hose that brought in fresh air from outside the containment. (*Id.*) Mr. Amorgianos did not, however, wear the respirator underneath the air-supplied hood during sandblasting. (*Id.* at 45.) Mr. Amorgianos complained that the dust collector used during sandblasting did not have enough capacity to clear adequately the air within the containment. (*Id.* at 43–45.)

With regard to spray-painting, Mr. Amorgianos stated that there were occasions during his first three or four weeks on the Project (i.e., from July 22, 1995 to August 11 or August 18, 1995) that he performed spray-painting work. (*Id.* at 59.) Mr. Amorgianos was provided with a single organic vapor filter for his respirator at that time, but was not given a replacement, and was forced to use that

---

1. Plaintiffs do not claim that Mr. Amorgianos's alleged injuries were due to exposure

(excessive or otherwise) to lead paint dust.

same organic vapor filter for "a couple of weeks." (*Id.* at 60.) Later in the operation, he returned to spray-painting, but he was told no organic vapor filters were available, so he used only a lead dust filter for at least the last two weeks he was on the job (i.e., August 15, 1995 to August 28, 1995). (*Id.* at 61–62.) Mr. Amorgianos further testified that the dust collector was not turned on during spray-painting, the fresh air louvers were kept closed, and there was no fan inside the containment. (*Id.* at 50–53, 58.)

During Mr. Amorgianos's direct examination, plaintiffs introduced what they alleged to be the actual respirator Mr. Amorgianos was using when he became ill on August 28, 1995. (*Id.* at 78, 82.)[2] Mr. Amorgianos testified that he had been using that very respirator for the preceding two or three weeks, including during spray-painting. (*Id.* at 83.) The respirator, as introduced, contained only a lead dust filter. (*Id.* at 78, 83.) Mr. Amorgianos stated that he had used that particular filter for the last three days he worked. (*Id.* at 76.) As later noted by the trial judge, the respirator and filter were in clean, "rather pristine" condition. (Tr. 9/29/98, at 38; *see also id.* at 36–37 (noting that there was "not a speck of paint on the mask"), 42–45.)

Plaintiffs' expert industrial hygienist, Jack Caravanos ("Caravanos"), who testified after Mr. Amorgianos, stated on cross-examination that after one week or even one day of use, he would expect to see paint particles deposited on the lead dust filter, which is pink. (Tr. 6/18/98, at 79–80.) When shown the respirator Mr. Amorgianos allegedly used for the last two weeks of the job, Caravanos acknowledged that there was no identifiable paint residue on its exterior or on the filter. (*Id.* at 82, 89–91.)

On redirect, plaintiffs' counsel asked Caravanos to assume that Mr. Amorgianos had placed a T-shirt over the front of his respirator while painting, (*id.* at 99), though Mr. Amorgianos had given no such testimony. Plaintiffs' counsel asked whether under those circumstances Caravanos would expect to see paint materials on the respirator or filter; Caravanos answered "no." (*Id.* at 99–100.) Caravanos also opined that the paints Mr. Amorgianos used—including those labeled "pigmented" epoxy and the third coat, which Caravanos previously testified "was a very unique color, sort of the color of maroon, so I remember it quite well," (*id.* at 9)—might actually be colorless and that, as a result, it would only be possible to detect paint on the respirator through chemical analysis, (*id.* at 91, 99–100, 117–118.) Caravanos performed no chemical analysis on the respirator or filter. (*Id.* at 89.)

Plaintiffs subsequently called a friend of Mr. Amorgianos and a fellow painter on the Project, Nikos Kpitikos ("Kpitikos"). (*See* Tr. 6/23/98, at 3–4.) Kpitikos testified that the "company used to send the [organic vapor] filters [to the site] but somebody used to take it and they didn't give it to us." (*Id.* at 12; *see also id.* at 13 ("The company used to send it but nobody gave it to us. They were disappearing.").) As a result, while painting, he and the other workers would put a piece of cloth or a blouse over the front of the respirator mask. (*Id.* at 13–14.) Kpitikos also stated

---

**2.** Mrs. Amorgianos testified that when she picked Mr. Amorgianos up on his last day of work, he did not bring his painter's uniform or any of his painting equipment with him, though he was carrying a black bag. (Tr. 6/17/98, at 138.) Further, one of Mr. Amorgi-anos's co-workers who testified for plaintiffs, Nikos Kpitikos, testified the workers on the Project did not take their respirators home with them but rather left them at the worksite. (Tr. 6/23/98, at 26.)

that, although it was available, the workers would not use air-supplied hoods during painting because they were bulky and made maneuvering around the bridge's undercarriage difficult. (*Id.* at 10–12.)

In an expert report prepared after the first trial, plaintiffs' new putative expert on neurology and toxicology, Dr. Jonathan S. Rutchik ("Dr. Rutchik"), stated that Mr. Amorgianos had described his protective gear as follows: gloves, boots, a Tyvek[3] suit, a half-face mask respirator with lead dust filters, no goggles, and no hood or outside air hose. (*See* Def.'s Letter Brief of 12/6/99, Ex. D, at 3 (Dr. Rutchik's Expert Report).) Dr. Rutchik's report makes no mention of a practice of covering the front of the respirator with a T-shirt. (*See id.*)

### 2. Defense Evidence

Defendants called Robert Faulkner ("Faulkner"), who worked as the foreman on the Project during the week beginning August 23, 1995. (Tr. 6/23/98, at 199–200, 204–205.) Faulkner testified that during spray-painting, the painters wore air-supplied Tyvek spray hoods, respirators and organic vapor filters. (*Id.* at 201–02.) Faulkner stated that at no time that week were organic vapor filters unavailable and that Mr. Amorgianos never complained that he did not have one. (*Id.* at 202.) On Mr. Amorgianos's last day of work, Faulkner observed him coming out of the containment wearing a Tyvek suit and a respirator. (*Id.* at 204.)

Defendants also called John Strika ("Strika"), the chairman of the greater New York bridge painters' union. (Tr. 6/24/98, at 8–9.) Strika testified that he worked as a job steward on the Project throughout July and August 1995 (with the exception of the week of August 23–29,

when he was on vacation), and that his son worked on the Project as a painter at the same time. (*Id.* at 9–10, 12–13, 14–15, 19–20.) Strika testified that there was a ready supply of organic vapor filters on hand at all times and that he had received no complaints from the painters that they were not available. (*Id.* at 11–12.) Strika did not see any painters using respirators with T-shirts wrapped around them. (*Id.* at 13.) However, according to Strika, the painters did not use respirators at all during painting, but instead used soft hoods with pressurized air supplies. (*Id.* at 21–23.) The hood was necessary to keep paint vapors from burning the painters' eyes and to keep paint out of the painters' faces. (*Id.* at 27, 34–35 (explaining that the front of the hood had multiple layers of a clear cellophane-like material, which could be peeled off one by one as each became covered with paint).)

Ralph P. Romano, one of the owners of Romano Enterprises, testified that there were always organic vapor filters available on site. (Tr. 6/24/98, at 60.) Mr. Romano also testified that he visited the site on a number of occasions and would sometimes go into the containment. (*Id.* at 56.) On those occasions, he would wear a Tyvek suit with an air-supplied hood, but no respirator. (*Id.*) On such occasions during July and August 1995, he observed the painters wearing Tyvek suits and hoods. (*Id.* at 57.)

### B. Standard Industrial Hygienic Practice

On the issue of what standard industrial hygiene required in the way of personal protective gear and ventilation on the Project plaintiffs offered the testimony of their certified industrial hygienist, Jack

---

**3.** Tyvek is a synthetic, paper-like fabric used, inter alia, for making protective apparel. See <http://www.Tyvekprotective apprl.com/products/faqs> (visited February 8, 2001).

Caravanos. Defendant called a certified industrial hygienist of its own, Frederick Toca ("Toca").

The two witnesses were in agreement that a lead dust filter (with or without a T-shirt wrapped over it) is completely ineffective at filtering organic solvents and that proper industrial hygienic practice is to provide painters working in an enclosed space with a ready supply of organic vapor filters. (*See* Tr. 6/18/98, at 30–31, 38 (Caravanos); Tr. 6/23/98, at 146–47, 159–60, 166 (Toca).) Neither Caravanos nor Toca testified as to whether use of an air-supplied hood without a respirator and organic vapor filter would be effective protection against organic solvent vapors.

On the issue of proper ventilation, Caravanos testified the dust collector should have been turned on, a fan should have been inside the containment, and the fresh air louvers should have been opened in order to prevent a concentration of organic solvent from accumulating inside the containment during the spray-painting operation. (Tr. 6/18/98, at 23, 27–28.) For his part, Toca was unwilling to opine on whether such ventilation was necessary without having seen how much ventilation was already available through the seams in the containment and its entryway. (Tr. 6/23/98, at 166–67, 171–73.) Toca, however, said that he would defer to the opinion of the industrial hygienist who had been contracted to inspect the site, Robert Leighton ("Leighton") of Leighton Associates, Inc. (*Id.* at 167–68.) Leighton separately testified that he believed that the dust collector should have been on and the air louvers opened during both sandblasting and spray-painting. (Tr. 6/22/98, at 117, 124.)

Therefore, there was no serious dispute at trial that the safety measures (or lack thereof) alleged by Mr. Amorgianos—viz., use of a respirator fitted only with a lead dust filter and the absence of ventilation inside the containment would represent a departure from proper industrial hygienic practice.

### C. Mr. Amorgianos's Alleged Illness

#### 1. Direct Examination of Mr. Amorgianos

On direct examination, Mr. Amorgianos testified as follows regarding his alleged illness.

On August 28, 1995, Mr. Amorgianos started work at 7:00 a.m., stopped work at 2:30 p.m., and took two 10 minutes breaks in between. (Tr. 6/17/98, at 87.) Throughout the day, he spray-painted inside the containment, wearing only a respirator with a lead dust filter. (*Id.* at 87, 90.) Toward the end of the day, he began to feel dizzy. (*Id.* at 89.) His eyes started to close, and he felt exhausted. (*Id.*) When he finished working, he could not open his eyes and had to call his wife to pick him up from work. (*Id.* at 90.) He went home with a fever of 103 degrees. (*Id.*) His whole body was swollen and itchy, and his joints would not move. (*Id.* at 90–91.)

The next morning, August 29th, he felt worse and did not go to work. (*Id.* at 91.) The following day, August 30th, he showed the same symptoms and was now sweaty and had headaches. (*Id.*)

At that point, Mr. Amorgianos visited a neighborhood doctor, who prescribed pills for his itching and swelling. (*Id.* at 92.) That doctor referred to him to one Dr. Vlattas, whom he visited a week later, just after Labor Day, 1995. (*Id.*) At that point, his condition was not any better, he could not move from bed, and Dr. Vlattas recommended that he see an internist. (*Id.* at 92–93.)

Sometime in September, 1995, on Dr. Vlattas's recommendation, Mr. Amorgianos visited Dr. Moline, a board certified

internist and the director of the occupational medicine program at Mount Sinai Hospital in Manhattan. (*Id.* at 93.) Dr. Moline ordered an MRI of his brain and blood tests. (*Id.* at 94.) Mr. Amorgianos continued to see Dr. Moline every four to six weeks from then until the trial in June, 1998. (*Id.*)

Mr. Amorgianos testified that during that approximately three-year period his condition did not change, but in fact became worse. (*Id.*) He allegedly has no feeling in his hands, he drops things, his knees buckle beneath him, and he can no longer walk as well as he could before the exposure. (*Id.* at 94–95.) Every day, he gets worse. (*Id.*) He has no reflexes on the left side of his body, and his whole body is numb and tingly. (*Id.* at 95.) He can no longer do outdoor or athletic activities. (*Id.*)

A typical day for him as of the time of trial was to stay at home and depend on his wife for everything. (*Id.*) His wife must help him dress, and sometimes, he is unable to get off of the toilet by himself because his body becomes numb. (*Id.* at 95–96.) He is depressed and can no longer have sex or work. (*Id.* at 96.)

## 2. Cross Examination of Mr. Amorgianos

On cross-examination, Mr. Amorgianos testified that there had never been a period from August, 1995 to the trial during which he felt better. (*Id.* at 108.) During that time, he was able to leave the house to have dinner with his wife only "a couple of times." (*Id.*)

However, Mr. Amorgianos admitted that, notwithstanding his alleged condition, he had in fact vacationed in Greece two or three times during that period. (*Id.* at 109.) In addition, he admitted that he can

and does drive a car and that he had traveled to Ohio in October 1996. (*Id.* at 109–110.)

While in Ohio, Mr. Amorgianos was involved in a car accident. (*Id.* at 110.) During the accident, he hit his head and developed a headache, so he took a taxi to the emergency room at St. Joseph Health Center in Warren, Ohio ("St. Joseph's"). (*Id.* at 110, 124, 125.) The emergency room notes, which were admitted into evidence, read as the follows: "The patient denies any weakness or numbness. He said his headache has improved significantly after he took ... aspirin. He denies any weakness or numbness." (*Id.* at 113–14 (St. Joseph's ER dictation, 10/20/96).) [4] In addition, as was revealed during cross-examination of Dr. Moline, St. Joseph's records indicate that Mr. Amorgianos was given a complete neurological workup, including a cervical spine X-ray and CT scan, all with normal results. (Tr. 6/18/98, at 143.) The records further report: (1) "Grasp—both hands normal;" (2) "no sensory or motor deficit;" (3) normal reflexes in both the upper and lower extremities; (4) that Mr. Amorgianos was alert and oriented as to person, place and time; (5) a nurse's note reading "bilateral, equal, strong hand grasp, steady gait;" (6) "motor strength five over five;" (7) a normal sensory exam; and (8) "healthy" in a blank for past medical history. (*Id.* at 143–48.)

Nonetheless, Mr. Amorgianos testified that there have been no times since his accident that he has been able to walk normally. (Tr. 6/17/98, at 116.) Two or three blocks is the maximum that he can walk. (*Id.*) After that, he gets tired, and his knees buckle beneath him. (*Id.*)

## 3. The Surveillance Video

At that point in Mr. Amorgianos's testimony, the defense revealed, outside the

---

4. Mr. Amorgianos, however, denied making such a statement. (*Id.*)

presence of the jury, the existence of a video surveillance tape taken of Mr. Amorgianos in Queens, New York on June 3, 1998. (*Id.* at 117–122, 141.) The tape, which was admitted into evidence and later played for the jury, shows Mr. Amorgianos driving, walking without a cane or any other type of assistance for many blocks, entering and leaving a coffee shop and a bank, all over the course of the morning and afternoon. (*See* Pls.' Ex. 12, received 6/22/98.) As described by the trial judge, the tape showed Mr. Amorgianos walking "much more than a quarter of a mile without any difficulty." (Tr. 9/29/98, at 69; *see also id.* at 34–35).

### 4. Mrs. Amorgianos's Testimony

Notwithstanding the surveillance video, Mrs. Amorgianos subsequently testified that her husband's condition has only become worse since August, 1995. (Tr. 6/17/98, at 132.) According to her, he cannot walk up two steps, or he will fall down. (*Id.*) He cannot hold a bottle of ketchup or a cup of coffee. (*Id.* at 132, 139–40.) He has numbness and tingling all the time and sometimes cannot get off the toilet by himself. (*Id.*) He cannot sleep, he sweats all night, and he cannot have sex. (*Id.* at 132–33.) He has not worked since August, 1995. (*Id.* at 134.) He cannot dress or bathe himself. (*Id.* at 135.) On a typical day, he gets up, has breakfast, sometimes tries to go for a walk, but gets exhausted and spends the rest of the day on the couch. (*Id.* at 136.)

In addition, Mrs. Amorgianos testified that her husband's emotional and cognitive functions have been impaired. According to her, Mr. Amorgianos is depressed, noncommunicative and emotionless. (*Id.* at 134–35.) His memory is very short-term, and he cannot remember anything. (*Id.* at 140.)

### 5. Dr. Moline's Testimony

Dr. Moline was also called to testify regarding Mr. Amorgianos's medical condition. Dr. Moline stated that she had seen Mr. Amorgianos 16 or 17 times and, during that period, his symptoms have essentially remained constant. (Tr. 6/18/98, at 125.) According to Dr. Moline, he is profoundly weak, the range of motion in his joints is significantly limited, he has difficulty moving his knees, and he cannot lift his left arm. (*Id.* at 126, 163.)

Dr. Moline related at length what Mr. Amorgianos had told her about his condition. He reported to her that he has trouble dressing. (*Id.* at 163.) He has difficulty gripping a coffee cup, his arms are weak, his knees buckle when he walks, and his reflexes are gone so that he cannot break his fall. (*Id.*) He cannot walk for a quarter of a mile, but rather only five or six blocks. (*Id.* at 134, 162.) He feels constant numbness and tingling. (*Id.* at 127.)

Dr. Moline had a battery of tests performed on Mr. Amorgianos, including electromyography ("EMG"), nerve conduction velocity studies ("NCVS"), reflex tests and grip strength tests. The results were worse than normal, though asymmetrical in their distribution across his body: his grip strength was about ½ of what it should be in his right hand, but only ⅛ to ½₀ of what it should be in his left hand. (*Id.* at 128–29.) Mr. Amorgianos's "[l]eft hand was always significantly worse than [his] right." (*Id.* at 129.) Based on these results, Dr. Moline opined that Mr. Amorgianos was suffering from a peripheral neuropathy, permanent in nature. (*Id.* at 131–32.) In addition, based on the elimination of known causes of peripheral neuropathy, such as diabetes, Dr. Moline opined that Mr. Amorgianos's peripheral neuropathy was caused by his workplace exposure to organic solvents. (*Id.*)

On cross-examination, Dr. Moline was extensively questioned about the Ohio medical records and stated that they had no effect on her opinion that Mr. Amorgianos suffers from peripheral neuropathy. (*Id.* at 143–49, 180.) In addition, notwithstanding Mr. Amorgianos's testimony that there has never been a time since the accident that he felt better, Dr. Moline, who had been advised by plaintiffs' counsel of the surveillance video showing Mr. Amorgianos walking throughout the course of a day, testified that sometimes Mr. Amorgianos has good days on which he is able to walk farther, and sometimes he has bad days. (*Id.* at 161, 164.) Finally, when questioned whether the EMG and NCVS she had performed on Mr. Amorgianos supported her diagnosis of peripheral neuropathy, Dr. Moline acknowledged that she was not personally qualified to interpret EMGs or NCVS and testified that she was relying on an interpretation of the results of those tests by a Mount Sinai physiatrist, Dr. Nahid Nainzadeh, and a Mount Sinai neurologist, Dr. Carl Bazil. (*Id.* at 151–155.)

### 6. Defense Medical Witnesses

#### a. Dr. Rubin

On the issue of Mr. Amorgianos's diagnosis, the defense called Dr. Michael Rubin, a neurologist. (Tr. 6/22/98, at 3.) Dr. Rubin is the director of the EMG lab and neuromuscular service at New York Hospital–Cornell Medical Center and an associate professor at Cornell University Medical College. (*Id.* at 6.) Dr. Rubin was retained to examine Mr. Amorgianos by an independent medical examination ("IME") provider. (*Id.* at 8.)[5]

Dr. Rubin examined Mr. Amorgianos on April 2, 1996. (*Id.* at 8.) Mr. Amorgianos reported that following exposure to epoxy paint in an enclosed space on August 28, 1995, he had suffered numbness and tingling over his whole body, though more so on the left side, as well as pain in his bones. (*Id.* at 9.) Mr. Amorgianos also reported that following the accident, his knees would begin to give out, and he found it difficult to walk. (*Id.*) Mr. Amorgianos stated that he had not had any problems prior to the August, 1995 exposure. (*Id.*)

Dr. Rubin conducted a physical exam and found Mr. Amorgianos's responses were "entirely normal except for sensation testing." (*Id.* at 10.) Dr. Rubin testified that these sensation tests are subjective, meaning that the physician simply records whatever the patient tells him or her. (*Id.*) Mr. Amorgianos reported decreased sensitivity to pin prick and vibration over his left arm and leg, and over his chest and abdomen. (*Id.*) His mental status, strength, reflexes, walking, balance and coordination were normal. (*Id.* at 10, 50.)

Dr. Rubin also performed an EMG and NCVS. (*Id.* at 10–11.) The results did not evidence peripheral neuropathy, though a single abnormal result in his left arm suggested a pinched nerve in the neck. (*Id.* at 11–13.) Dr. Rubin recommended that Mr. Amorgianos return to work. (*Id.* at 13.)

#### b. Dr. Budabin

The defense also called Dr. Murray Budabin. Dr. Budabin is board-certified neurologist and an associate clinical professor of neurology at Mount Sinai Hospital in Manhattan. (Tr. 6/23/98, at 56.) Dr. Bu-

---

5. In colloquy outside the presence of the jury, it was indicated that the IME company had been retained by the worker's compensation carrier that covered Mr. Amorgianos's employer. Dr. Rubin testified to the jury that he was unaware who had contracted for the IME. (Tr. 6/22/98, at 14–15.)

dabin was retained by the defense to examine Mr. Amorgianos and did so on October 7, 1997. (*Id.* at 58.) Mr. Amorgianos complained of weakness, numbness, tingling and joint pain. (*Id.* at 61.) Upon neurological examination, Mr. Amorgianos showed abnormal signs on tests that the examinee can voluntarily control, such as gait or arm strength, but on objective testing, his peripheral nerve responses were normal. (*Id.* at 68.) Review of an EMG and NCVS that had been performed by a Dr. Kyriakides for Dr. Vlattas, showed an abnormal results in Mr. Amorgianos's left calf muscle and in his left and right deltoids, but his NCVS was normal. (*Id.* at 90, 92–98, 99). Dr. Budabin testified that these results provided no evidence of peripheral neuropathy; the abnormal result for the deltoids and left calf muscle was indicative of a possible cervical radiculopathy. (*Id.* at 98.) According to Dr. Budabin, cervical radiculopathy most commonly results from a particular nerve in the cervical spine being compressed at its root by a herniated disc or being traumatically injured; cervical radiculopathy is not caused by exposure to toxic substances. (*Id.* at 101–102.) Dr. Budabin opined that based on Mr. Amorgianos's history, his physical examination, the EMG and NCVS, there was no evidence of peripheral neuropathy. (*Id.* at 102.)

### 7. Health Condition of the Other Workers on the Project

Although there were six to eight workers on the Project, (Tr. 6/17/98, at 83–85), no evidence was presented that any of the other workers suffered the type of permanent illnesses Mr. Amorgianos alleges.

### D. Causation Testimony

#### 1. Caravanos

Plaintiffs presented Caravanos, a certified industrial hygienist, on, *inter alia*, the issue of causation. (Tr. 6/18/98, at 3.) Caravanos holds a B.S. in Environmental Health Science from the City University of New York, an M.S. in Environmental Health from Brooklyn Polytechnic Institute, and a Doctorate in Public Health from Columbia University. (*Id.* at 2.) He is the chairman of the Hunter College industrial hygiene program and also serves as an adjunct assistant professor at Robert Wood Johnson Medical School of the University of Health and Dentistry of New Jersey. (*Id.* at 4, 6.)

Caravanos testified that because the enclosure in which Mr. Amorgianos worked was airtight and the fresh air louvers were kept closed during spray-painting, paint fumes accumulated within the enclosure. (*Id.* at 12.) These fumes consisted of vapor from the organic solvents of which the paint products used on the Project were partly composed. (*Id.* at 25.) Caravanos opined that the concentration of these vapors within the containment had reached dangerous, life-threatening levels. (*Id.* at 23–24.) Specifically, Caravanos opined that, based on his calculations of the amounts of paint used, the volume of the containment, and the amounts of organic solvents within the paint products, the concentration of a particular organic solvent, xylene, was in the "thousands" of parts per million ("ppm"). (*Id.* at 40–41.) Caravanos further testified that the Occupational and Safety Administration ("OSHA") has promulgated a personal exposure limit ("PEL") for xylene of 100 ppm. (*Id.* at 41.) [6] Caravanos opined that Mr. Amorgi-

---

**6.** The PEL is the time-waited average concentration to which a worker can be safely exposed over the course of an eight-hour work-

day. *See* 29 C.F.R. § 1900.1000 tbl. Z–1 n. 1. OSHA promulgates PELs for hundreds of workplace chemicals. *See id.* tbl. Z–1.

anos's exposure to a concentration of xylene in excess of the OSHA PEL, without the protection of a respirator fitted with an organic vapor filter, was the likely cause of Mr. Amorgianos's alleged illness. (*Id.* at 52–53.)

On cross-examination, Caravanos admitted that he did not have a medical degree. (*Id.* at 59.) His opinion that exposure to xylene at levels he estimated caused Mr. Amorgianos's particular set of symptoms was based on a literature search on medical databases. (*Id.* at 60.) Specifically, he searched MEDLINE and TOXLINE for the key words "xylene poisoning in painters" and found hundreds of references. (*Id.* at 110–11.) So, he "just printed the first 50." (*Id.* at 111.) When asked whether he read the referenced articles themselves, Caravanos stated that he had "read some of the abstracts." (*Id.* at 111.) At that point, the trial judge ordered that his testimony on causation be stricken as incompetent in light of his failure to read any of the articles and the fact that he is not an epidemiologist. (*Id.* at 112–16.)

### 2. Dr. Moline

Dr. Moline testified briefly that she believed to a reasonable degree of medical certainty that Mr. Amorgianos's exposure to organic solvents on the Project caused his peripheral neuropathy, based on the chemicals to which he was exposed, the timing of the onset of his illness, his manifestation of symptoms described in the medical literature on organic solvents, and her elimination of known causes of PN, such as diabetes. (*Id.* at 132–33.)

### 3. Dr. Budabin

Dr. Budabin was not questioned at length on the issue of causation, but he testified that exposure to toxic substances would not cause a neuropathy that was asymmetrical in nature, except if one were to place one's hand into a toxic substance. (Tr. 6/23/98, at 69.) Dr. Budabin testified that since other types of chemical exposure (such as inhalation) have a systemic effect, any resulting neuropathy would be equal in both sides of the body. (*Id.*) Such an effect would stand in contrast to Mr. Amorgianos's alleged symptoms, which were allegedly much worse on the left side of his body than the right. (*Id.*)

### (4)

### The Verdict

On June 26, 1998, the jury returned a verdict for plaintiffs in the amount of $2.3 million after adjusting for its finding that Mr. Amorgianos was comparatively 30% at fault.

### (5)

### Post–Trial Proceedings

On August 7, 1998, defendant moved for judgment as a matter of law or, in the alternative, for a new trial.

On September 29, 1998, the trial judge denied defendant's motion for judgment as a matter of law, but granted its motion for a new trial, finding that the verdict was "fundamentally against the overwhelming weight of the evidence" and represented a "miscarriage of justice." (Tr. 9/29/98, at 67.) The trial judge based his decision on a number of factors, including:

(1) the video surveillance tape, which showed Mr. Amorgianos walking "much more than a quarter of a mile without any difficulty," (*id.* at 69; *see also id.* at 34–35);

(2) the Ohio medical records related to Mr. Amorgianos's car accident, which showed a normal neurological exam and in which he reported none of the symptoms claimed in the present action, (*see id.* at 35, 68–69, 71–72);

(3) defense neurologists had testified that the effects of toxically-induced periph-

eral neuropathy typically present in an symmetrical pattern, but plaintiff's alleged peripheral neuropathic illness was asymmetrical, (see id. at 36, 64, 68);

(4) the absence of any paint residue on the respirator plaintiff allegedly used on the Steinway Street Bridge Project, and plaintiff's failure to produce any plausible explanation for its "rather pristine" condition, (see id. at 36–38, 42–45); and

(5) the deficiencies in plaintiffs' medical evidence, including the fact that Caravanos had offered an opinion on general causation based only on a review of article abstracts and not the articles themselves, (see id. at 38, 51); and doubts as to the credibility of Dr. Moline's trial testimony, (see id. at 54, 72–73).

The trial judge expressly noted that his decision was not based on any one of these factors considered in isolation but rather on the cumulative effect of all of them taken together. (See id. at 45, 69–70.)

At plaintiffs' request, this case was reassigned to the undersigned judge for retrial. Subsequently, plaintiffs retained a new putative expert on neurotoxicology, Dr. Jonathan S. Rutchik, and defendant retained a new toxicology expert of its own, Dr. Jack W. Snyder.

After the completion of additional expert discovery, defendant moved to preclude plaintiffs' expert witnesses on the ground that their opinions were not sufficiently reliable under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc. and its progeny.

## Discussion

### (1)

▉ Under New York law, when the determination of whether an illness or injury was caused by some event or conduct is "presumed not to be within common knowledge and experience," a plaintiff must produce expert opinion evidence "based on suitable hypotheses" in order to support a finding of causation. Meiselman v. Crown Heights Hosp., 285 N.Y. 389, 396, 34 N.E.2d 367, 370 (1941); see Fane v. Zimmer, Inc., 927 F.2d 124, 131 (2d Cir.1991).

As a threshold matter, it must be noted that this is not a case in which the burden-shifting analysis announced in Martin v. Herzog, 228 N.Y. 164, 126 N.E. 814 (1920), applies. In Martin v. Herzog, Judge Cardozo held that there is prima facie evidence of a causal link between an offending party's negligence and a victim's injury where the offending party violates an ordinance enacted to protect human safety and the victim suffers the very type of injury the ordinance was designed to protect against. See Martin v. Herzog, 228 N.Y. at 170, 126 N.E. at 816; see also Valencia v. Lee, 123 F.Supp.2d 666, 685–86 (E.D.N.Y.2000) (applying New York law) (shifting burden on causation where infant plaintiff, who had blood lead levels above limit established by federal and municipal health agencies, developed learning disabilities). Here, it will be assumed for the purpose of deciding this motion that Mr. Amorgianos was exposed to xylene in concentrations in excess of the 100 ppm PEL or the 150 ppm short-term exposure limit ("STEL") promulgated by OSHA. Mr. Amorgianos's alleged illness, however, is not of the type that the OSHA PEL and STEL for xylene were promulgated to protect against. In the release notes accompanying its promulgation of the xylene PEL and STEL, OSHA stated that it adopted the xylene PEL and STEL to protect workers against three specific adverse health effects: (1) narcosis; (2) eye irritation; and (3) adverse serologic effects. See Air Contaminants, 54 Fed.Reg. 2332, 2477 (1989) (final rule amending 29 C.F.R. § 1910.1000). The 1989 release notes—which post-date most of the re-

search cited by plaintiffs' experts, *see infra* Appendix tbls. 1–3—do not recite chronic CNS or PNS effects as a justification for the adopted PEL or STEL. *See id.* Thus, even if one assumes that Caravanos's estimate of the concentration of xylene within the containment is correct, plaintiffs are not entitled to shift the burden of proof on causation to defendant under the rule of *Martin v. Herzog* based on the alleged violation of the OSHA exposure limits.

Accordingly, this case presents five distinct issues on which plaintiffs must produce admissible expert opinion evidence:

(1) What does standard industrial hygienic practice require in the way of personal protective gear and ventilation for the type of spray-painting operation conducted during the Steinway Street Bridge Project?;

(2) Is plaintiff ill, and, if so, what is his diagnosis?;

(3) To what dose of xylene or other organic solvents was plaintiff exposed while on the Project, and for what duration?;

(4) Can exposure to xylene (or the other organic solvents contained in the paint products with which plaintiff worked) in the amount and for the duration experienced by plaintiff cause an individual to develop the particular complex of CNS and PNS symptoms that plaintiff allegedly suffers?; and

(5) Was plaintiff's exposure to xylene (and other organic solvents) the specific cause of *his* alleged development of these CNS and PNS symptoms?

The issue presented by question (4) is commonly referred to as that of "general causation," and that presented by question (5) as "specific causation." *See Mancuso v. Consolidated Edison Co. of N.Y.*, 56 F.Supp.2d 391, 394–95 (S.D.N.Y.1999), *aff'd in relevant part,* 216 F.3d 1072, 2000 WL 730417 (2d Cir.2000) (Table).

Plaintiffs have proffered Dr. Moline, Caravanos, and a new putative expert on toxicology and neurology, Dr. Jonathan S. Rutchik ("Dr. Rutchik"), to testify on these questions. Defendant has moved to exclude the testimony of these witnesses on questions (3) and (4), on the ground that their opinions as to the dose and duration of Mr. Amorigianos's exposure to xylene and on general causation are not sufficiently reliable to meet the standards for admissibility under Federal Rule of Evidence 702 set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.[7]

---

7. Plaintiffs' experts' opinions on questions (1), (2), and (5) appear to be reliable under *Daubert.*

As to question (2), although, in granting a new trial, the trial court could properly take exception to the fact that Dr. Moline, in forming her diagnosis, relied on the interpretation of Mr. Amorigianos's EMGs and nerve conduction studies by neurologists who did not testify at trial, her testimony, nevertheless, was admissible and was admitted. As detailed above, Background (3)(B), the dispute at trial centered instead on the non-expert issue of whether Mr. Amorigianos was in fact provided with such equipment.

As to question (2), although in granting a new trial, the trial court could properly take

exception to fact that Dr. Moline, in forming her diagnosis, relied on the interpretation of Mr. Amorgianos's EMGs and nerve conduction studies by neurologists who did not testify at trial, her testimony nevertheless, was admissible and was admitted. *See* Fed. R.Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted."); *id.* advisory committee's note (observing that "a physician in h[er] own

Effective December 1, 2000, Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.[8] The proponent of expert evidence under Rule 702 must establish its admissibility by a preponderance of the evidence. *See id.* adv. committee note (2000 Amendments) (citing *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)); *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. at 2796 n. 10.

## A. *Daubert*

In its landmark decision in *Daubert,* the Supreme Court established a two-prong test for admissibility of expert scientific testimony: the testimony must (1) relate to "scientific knowledge" and (2) "assist the trier of fact to understand or deter-mine a fact in issue." 509 U.S. at 592, 113 S.Ct. at 2796. The Court described the first requirement as one of "evidentiary reliability," and the second as one of "fit." *Id.* at 589–92, 113 S.Ct. at 2795–96.

■ In assessing the reliability of a proffered expert's testimony, a district court's inquiry under *Daubert* must focus, not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology. *See id.* at 590, 595, 113 S.Ct. at 2795, 2797. To assist district courts in making this preliminary assessment, the Court enumerated four non-exclusive factors for determining whether an expert opinion is reliable: (1) whether the expert's conclusions have been tested or are testable; (2) whether the expert's conclusions have been published and subjected to peer review; (3) in the case of a scientific technique, the potential or known error rate; and (4) whether the expert's conclusions have gained general acceptance in the relevant scientific community. *See id.* at 593–94, 113 S.Ct. at 2796–97.

The courts of appeals have applied other factors as well, such as whether the theory or method offered by the expert has been put to any non-judicial use, *see Cabrera v.*

---

practice bases h[er] diagnosis on information from numerous sources ..., including ... reports and opinions from nurses, technicians and other doctors" and concluding such basis "ought to suffice for judicial purposes").

Finally, as to question (5), Dr. Moline's opinion on specific causation was, as she testified at trial, based on (1) explicit consideration of a number of other known and suspected causes of peripheral neuropathy, (2) the elimination of those other possible causes through a variety of diagnostic tests, and (3) the temporal proximity of Mr. Amorgianos's alleged exposure and the onset of his alleged symptoms. As such, Dr. Moline's opinion on specific causation appears to be based on reliable methodology and a reliable application of that methodology and is admissible to the extent that the plaintiffs are able to produce admissible expert evidence as to question (4).

**8.** While this motion was pending, a proposal to amend Rule 702 to read as quoted above became effective. As the Advisory Committee Note to the 2000 Amendments makes clear, the amendment was not intended to effect a departure from *Daubert* or its progeny. *See* Fed.R.Evid. 702 adv. committee note (2000 Amendments) (endorsing the *Daubert* gatekeeping framework and extensively discussing post-*Daubert* decisions with approval). Consequently, post-*Daubert,* pre-amendment case law construing Rule 702 remains fully applicable to this motion and will be relied upon throughout this opinion.

*Cordis Corp.,* 134 F.3d 1418, 1420–21 (9th Cir.1998); *In re Paoli R.R. Yard PCB Ligit.,* 35 F.3d 717, 742 n. 8 (3d Cir.1994), "or whether they have developed their opinions expressly for purposes of testifying," *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) ("*Daubert II*").

■ Additional factors may be appropriate in a given case, and a district court enjoys the same "broad latitude" in deciding what are the "reasonable measures of reliability in a particular case" as it does in reaching its ultimate determination of reliability. *Kumho Tire,* 526 U.S. at 142, 153, 119 S.Ct. at 1171, 1176. Rule 702's standard of reliability is, however, "exacting," *Weisgram v. Marley Co.,* 528 U.S. 440, 455, 120 S.Ct. 1011, 1021, 145 L.Ed.2d 958 (2000), and does not, as some pre-*Daubert* courts held, turn simply on the quality of the proffered expert's credentials. *Compare, e.g., Ferebee v. Chevron Chem. Co.,* 736 F.2d 1529, 1534 (D.C.Cir.1984) ("On questions such as these, which stand at the frontier of current medical and epidemiological inquiry, if experts are willing to testify that such a link exists, it is for the jury to decide whether to credit such testimony."), *with* Fed.R.Evid. 702 adv. committee note (2000 Amendment) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" (quoting *Daubert II,* 43 F.3d at 1319)).

■ *Daubert's* second criterion of "fit" is essentially a requirement of relevance: "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert,* 509 U.S. at 591–92, 113 S.Ct. at 2796. A proffered expert opinion may fail to meet the fit requirement if it relates to "facts or data that have not been adequately established in the case." Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 47 (1994); *see* Fed.R.Evid. 702 (as amended) (providing that expert opinion is admissible if "based upon sufficient facts or data"). Thus, "[e]ven if an expert testifies that Substance X can cause the plaintiff's injury, this testimony will not suffice if the plaintiff failed to produce evidence that he or she was exposed to Substance X ... or at a significant level." *Id.* at 48. Similarly, where there is expert testimony that a given substance can cause a certain condition, but an exposed plaintiff complains of a different condition, the expert's opinion, even if reliable, does not fit the facts of the case, is not helpful to the trier of fact, and, thus, is inadmissible.

■ Accordingly, in a toxic tort case, expert testimony on the issue of general causation meets *Daubert's* "fit" requirement only if the testimony includes an opinion that (1) exposure to the particular substance at issue, (2) in the dose to which the plaintiff was exposed, (3) for the duration in which plaintiff was exposed, (4) can cause the particular condition(s) of which the plaintiff complains.

**B. Application of *Daubert* to Expert Testimony Based on a Review of Existing Medical Literature**

Plaintiffs' experts have done no research of their own on the question of whether exposure to xylene or the other organic solvents to which Mr. Amorgianos was allegedly exposed in the amount and for the duration claimed by plaintiffs can cause the crippling peripheral neuropathy and CNS effects Mr. Amorgianos allegedly suffers. Instead, their methodology consists of an extrapolation from existing medical evidence on the relationship between exposure to various organic solvents and various PNS and CNS conditions, buttressed by the temporal proximity of the onset of Mr. Amorgianos's alleged illness to his alleged exposure to xylene and other organic

solvents on the Steinway Street Bridge Project.

Fortunately, in *Joiner*, the Supreme Court provided substantial guidance on the proper assessment of the reliability of expert testimony that is based on extrapolation from the findings of existing medical studies. Because there is conflicting Second Circuit authority on this issue,[9] an extended examination of the Supreme Court, court of appeals, and district court opinions in *Joiner* is necessary to ascertain the appropriate standards to be applied to this motion.

### 1. *Joiner* in the District Court

In *Joiner*, a plaintiff electrician who suffered from lung cancer alleged that he had been exposed to a dielectric cooling fluid which was contaminated with PCBs and other toxins in the course of his work with electrical transformers. Joiner proffered three experts who relied on epidemiological and animal studies to conclude that this exposure to PCBs had caused, or at least promoted, his subsequent development of lung cancer.

After conducting a searching review of the data relied on by Joiner's experts, the district court found that: (1) the authors of some of the epidemiological studies expressly stated that they had found no statistically significant association between PCBs and lung cancer; (2) the other epidemiological studies either did not mention PCBs or involved confounding factors, such as exposure to other toxins, and (3)

the experimental studies on mice involved a different type of cancer than that suffered by the plaintiff. *See Joiner v. General Elec. Co.*, 864 F.Supp. 1310, 1322–26 (N.D.Ga.1994), *rev'd*, 78 F.3d 524 (11th Cir.1996), *rev'd*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Stating that it was not persuaded that "th[ose] studies support the 'knowledge' the experts purport to have," the district court excluded the testimony of all three experts and granted summary judgment to the defendant manufacturer. *See id.* at 1326.

### 2. *Joiner* in the Court of Appeals

On appeal, the Eleventh Circuit reversed, holding that the district court's criticisms of the plaintiff's expert testimony went to the testimony's weight, rather than its admissibility. The court of appeals began by noting that the district court's evidentiary review was at odds with the " 'liberal thrust' " of *Daubert*, 509 U.S. at 588, 113 S.Ct. at 2794 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988)), and the Federal Rules of Evidence:

> It is important for trial courts to keep in mind the separate functions of judge and jury, and the intent of *Daubert* to loosen the strictures of *Frye* and make it easier to present legitimate conflicting views of experts for the jury's consideration.

*Joiner*, 78 F.3d at 530. The Eleventh Circuit then strongly criticized the district court for excluding "the testimony because

---

**9.** *Compare Washburn v. Merck & Co.*, 213 F.3d 627, 2000 WL 528649 (2d Cir.2000) (Table) (holding that district court did not abuse its discretion under Daubert, where district court excluded experts on basis of a critical analysis of studies on which they relied), with *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1126, 1133, 1139 (2d Cir.1995) (reviewing grant of judgment as matter of law, but in process suggesting that Daubert

does not permit district court to analyze studies upon which expert relies in determining admissibility; "the district court's analysis ... was rife with independent assessments of witnesses' conclusions ..., often in a manner that appears to us to stretch ... Daubert beyond [its] limit"), and *Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir.1998) (stating that lack of textual authority for expert's opinion goes to weight, not admissibility).

it drew different conclusions from the research than did each of the experts," and admonished that under *Daubert*, a district court should not "make independent scientific judgments on the basis of individual studies":

> [T]he gatekeeping responsibility of the trial courts is not to weigh or choose between conflicting scientific opinions, or to analyze and study the science in question in order to reach its own conclusions from materials in the field.

*Id.; see also id.* ("[*Daubert* ] is not intended to turn judges into jurors or surrogate scientists."); *cf. Maiorana*, 52 F.3d at 1137 (warning that "the law does not 'impose[ ] on [judges] either the obligation or the authority to become amateur scientists'" (quoting *Daubert*, 509 U.S. at 601, 113 S.Ct. at 2800 (Rehnquist, C.J., concurring in part and dissenting in part))).

On this latter point, Judge Birch specially concurred:

> Whether the conclusions advanced from the stated premises in fact follow and the persuasiveness of those conclusions in the ultimate resolution of competing opinions, are questions appropriately left to the finder of fact.

*Joiner*, 78 F.3d at 534–35 (Birch, J., specially concurring); *cf. Maiorana*, 52 F.3d at 1126, 1131, 1133, 1139 (in scrutinizing the studies relied on by expert, district court improperly "substituted its judgment for that of the jury").

Finally, reviewing the criticisms leveled by the district court against plaintiff's experts, the Eleventh Circuit held: "None of these reasons is sufficient to render an expert's opinion legally unreliable." *Joiner*, 78 F.3d at 532. The Eleventh Circuit, therefore, reversed the district court's ex-

clusion order, stating the "tests and criticisms cross-examination would supply," were the proper device for treating such deficiencies in expert testimony. *Id.; cf. Maiorana*, 52 F.3d at 1132 (district court's criticisms of expert's testimony went to weight and should have been dealt with through "the traditional devices of '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'" (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798)).

### 3. *Joiner* in the Supreme Court

In an eight-to-one decision authored by Chief Justice Rehnquist, the Supreme Court squarely rejected the Eleventh Circuit's reasoning and held that the district court's analysis was entirely proper under *Daubert*. The Court clarified that it is "within a District Court's discretion to conclude that the studies upon which the experts rel[y][are] not sufficient, whether individually or in combination, to support their conclusions" on causation. *Joiner*, 522 U.S. at 146–47, 118 S.Ct. at 519.[10] After reiterating that *Daubert* requires district courts to screen out unreliable expert testimony, *see id.* at 142, 118 S.Ct. at 517, the Court conducted an illuminating step-by-step review of the district court's analysis of the studies relied upon by Joiner's experts.

Agreeing with the district court at each step, the Court placed special emphasis on the fact that the authors of two of the epidemiological studies relied on by the plaintiff's experts were unwilling to conclude that those studies established a causal link between PCB's and lung cancer. *See id.* at 145, 118 S.Ct. at 518 ("Given that

---

**10.** Justice Stevens was alone among the justices in concluding that the *Joiner* district court had impermissibly assessed "the validity or strength of an expert's conclusions,

which is a matter for the jury." *Joiner*, 522 U.S. at 154, 118 S.Ct. at 523 (Stevens, J., concurring in part and dissenting in part).

Bertrazzi et al. were unwilling to say that PCB exposure had caused cancer among the workers they examined, their study did not support the experts' conclusion that Joiner's exposure to PCBs caused his cancer."); *id.* at 145, 118 S.Ct. at 519 (noting that increased incidence of lung cancer found in second study "was not statistically significant and the authors of the study did not suggest a link between the increase in lung cancer deaths and the exposure to PCBs"). The Court upheld the district court's rejection of the two remaining epidemiological studies on grounds of "fit": one was limited to a particular kind of mineral oil and did not mention PCBs; the other involved PCB-exposed workers who had also been exposed to numerous other potential carcinogens. *See id.* at 145–46, 118 S.Ct. at 519.

In another significant illustration of the "fit" requirement, the Court also rejected the animal studies upon which Joiner's experts relied. The Court noted that the studies in question involved *infant mice* that had developed alveologenic adenomas after massive doses of PCBs were injected directly into their stomachs and peritoneums; Joiner, however, suffered from small-cell carcinoma, an entirely different disease. *See id.* at 144, 118 S.Ct. at 518. Explaining that the "issue was whether *these* experts' opinions were sufficiently supported by the animal studies on which they purported to rely," the Court held that "[t]he studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them." *See id.* at 144–45, 118 S.Ct. at 518.

Most significantly, the Supreme Court definitively rejected the Eleventh Circuit's reasoning that a point-by-point examination of the data relied on by experts runs afoul of *Daubert's* admonition that a dis-

trict court's "focus ... must be solely on the principles and methodology, not the conclusions they generate," *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2797:

> Conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But *nothing in either* Daubert *or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.* That is what the District Court did here, and we hold that it did not abuse its discretion in so doing.

*Joiner,* 522 U.S. at 146, 118 S.Ct. at 519 (emphasis added) (citing *Turpin v. Merrell Dow Pharms., Inc.,* 959 F.2d 1349, 1360 (6th Cir.1992) ("The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue of [causation] is too wide. Under such circumstances, a jury should not be asked to speculate on the issue of causation.")).

### 4. Subsequent Second Circuit Authority

A recent Second Circuit decision confirms the bounds of a district court's discretion to exclude unreliable expert evidence as announced in *Joiner. See Washburn v. Merck & Co.,* 213 F.3d 627, 2000 WL 528649 (2d Cir.2000) (Table). In *Washburn,* the plaintiff's experts opined that the defendant's rubella vaccine had caused her to develop arthropathy, arthralgia and chronic fibromyalgia. The Second Circuit upheld the exclusion of the plaintiff's experts and the granting of summary judgment to the vaccine manufacturer, where the experts' opinions were based "on little more than temporal correlation between [the plaintiff's] vaccination and the onset of symptoms." *Id.,*

213 F.3d 627, 2000 WL 528649, at *2 (citing *Cavallo v. Star Enter.*, 892 F.Supp. 756 (E.D.Va.1995), *aff'd in relevant part*, 100 F.3d 1150 (4th Cir.1996); *Conde v. Velsicol Chem. Corp.*, 804 F.Supp. 972, 1023 (S.D.Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir.1994)). In particular, the Second Circuit rejected one expert's extrapolations from the medical literature as unreliable where, inter alia, (1) those studies explored a link between the vaccine and arthritis, rather than the specific chronic joint conditions alleged by the plaintiff, and (2) even "the evidence linking the vaccine with arthritis [was] derived mainly from anecdotal reports and small population studies with few controls." *Id.* Another of plaintiff's expert's opinion on causation was ruled to have been properly rejected where it "did not emanate from his own research in the field, but rather was developed for the purposes of litigation.... [The district court] reviewed the studies and articles that [the expert] used to conclude that there is a causal relationship between [the defendant's vaccine] and chronic joint conditions and found that none was a large-scale epidemiological study and most were either anecdotal, or did not involve [the defendant's vaccine]." *Id.* Earlier Second Circuit decisions that suggest such an examination of the authorities relied upon by a plaintiff's experts oversteps the bounds of a district court's discretion under *Daubert, e.g., Maiorana*, 52 F.3d at 1133, 1137, 1139,[11] therefore, no longer appear vital in the wake of *Joiner*.

## 5. Relevant Epidemiological Principles

In addition, in assessing whether plaintiffs' experts have reliably extrapolated their causal hypothesis from the existing medical evidence and the significance of temporal proximity of plaintiff's alleged exposure and illness, the fundamental principles of epidemiology, which are now becoming well known to the courts, provide additional guidance.

There are several different forms that epidemiological studies take in the areas of occupational medicine and toxicology. These various research designs differ in the evidentiary weight they lend to a hypothesis that exposure to a given substance causes a given condition. *See Environmental & Occupational Medicine* 44 (William N. Rom ed., 3d ed.1998) (cited by Dr. Rutchik as authoritative); *Reference Manual, supra*, at 131–38. The epidemiological studies cited by plaintiffs' experts fall into two general categories: (1) uncontrolled case studies or case reports; and (2) cross-sectional studies. *See infra* Appendix tbls. 1–3.[12]

"An uncontrolled case study, or case-series report, is not actually a formal epidemiologic investigation but simply the identification of an unusual occurrence or disease." Rom, *supra*, at 44. The principal function of such reports is to alert health professionals to the possibility of occupational causes of disease. *See id.* at 45. "In an occupational cross-sectional study, a survey is conducted to determine

---

11. Although *Maiorana* actually involved a determination of the sufficiency of expert opinion evidence already held admissible, the Second Circuit repeatedly stated that the type of inquiry engaged in by the district court in that case was beyond the limits of what *Daubert* would permit even on a preliminary assessment of admissibility. *See Maiorana*, 52 F.3d at 1133, 1137, 1139.

12. The literature cited by plaintiffs' experts also includes several review articles that summarize the results of existing studies and one experimental study on rats. *See infra* Appendix tbls. 1–3.

and compare the prevalence of disease or health status between groups of workers classified with respect to exposure status." *Id.* One of the main limitations of cross-sectional studies is that they are confined to actively employed workers who have chosen to participate; "[w]orkers who have left employment for reasons that might be related to exposure and those who choose not to participate are excluded." *Id.*

Because of their inherent limitations, these two study designs "usually represent preliminary or pilot investigations used to screen for possible workplace hazards or to generate hypotheses for testing in more complex designs." *Id.* at 44. In contrast, cohort studies, which test for the incidence of a health condition in a randomly selected group of exposed workers and a randomly selected group of unexposed workers over time, *see id.* at 46–47, and case-control studies, which compare the exposure histories of a group of workers who exhibit a particular health condition with a group of workers who do not exhibit the health condition but who are comparable in characteristics other than exposure, *see id.* at 47–49, are "the most informative investigations used to test specific etiological hypotheses and to confirm and quantify degrees of health risk related to causal exposures," *id.* at 44. Notably, none of the epidemiological studies cited by plaintiffs' experts was a cohort or case-control study. *See infra* Appendix tbls. 1–3.

Even when an appropriately designed study yields evidence of a statistical association between a given substance and a given health outcome, epidemiologists generally do not accept such an association by itself as proof of a causal relationship between the exposure and the outcome. *See* Rom, *supra,* at 50; *Casarett & Doull's Toxicology* 79 (Curtis D. Klaassen ed., 5th ed.1996) (cited by Dr. Rutchik as authoritative). Epidemiologists generally look to

several additional criteria to determine whether a statistical association is indeed causal. *See id.* These criteria are sometimes referred to as the Bradford Hill criteria, after the author of a leading statement of the principles. They are:

(1) Strength: How strong is the association between the suspected risk factor and the observed outcome?;

(2) Consistency: Does the association hold in different settings and among different groups?;

(3) Specificity: How closely are the specific exposure factor and the specific health outcome associated? I.e., how unique is the quality or quantity of the response?

(4) Temporality: Does the hypothesized cause precede the effect?;

(5) Biological plausibility: Does the apparent association make sense biologically?;

(6) Coherence: Is the association consistent with what is known of the natural history and biology of the disease?;

(7) Experimental verification: Does any experimental evidence support the hypothesis of an association?;

(8) Biological analogy: Are there examples of similar risk factors and similar outcomes?; and

(9) Dose-response relationship: Has a dose-response relationship been established, i.e., does the magnitude of the response increase as the magnitude of the dose increases? *See* Rom, *supra,* at 50–51; *Casarett & Doull's, supra,* at 79; *Reference Manual, supra,* at 160–164. The last criterion, establishment of a dose-response relationship, is considered critical in toxicology. *See Casarett & Doull's, supra,* at 18.

(2)

The toxicity of any substance depends critically on the dose to which a human being is exposed and for what duration.

*See Reference Manual, supra,* at 185; *Expert Evidence* 124 (Bert Black & Patrick W. Lee eds., 1997); (Rutchik Dep. at 301). Thus, in order for the jury to evaluate the hypothesis that Mr. Amorgianos's alleged illness could be caused by his level of exposure to xylene or other organic solvents, plaintiffs must establish what that exposure was in terms of dose and duration. On the question of dose, plaintiffs have profered Caravanos; on the question of duration, plaintiffs have profered Caravanos and Dr. Rutchik. For the reasons that follow, plaintiffs' experts' opinions as to dose and duration are excluded.

## A. Dose

### 1. How should dose be measured?

As an initial matter, it must be determined how dose should be measured in the circumstances of this case. Plaintiffs contend that it is appropriate to measure dose in terms of the ambient concentration of xylene vapor within the containment, and they have offered an estimate by Caravanos as to what the concentration was. Defendant, however, strenuously argues that it is an individual's absorption of a chemical that determines what effect the chemical will have on his body, and that estimates of dose (and, therefore, causal hypotheses about the effect of a chemical) must be given in terms of the amount of the chemical actually absorbed by the individual. Defendant further argues that the concentration of a chemical in the air breathed by an individual cannot serve as a proxy for the amount absorbed, because different individuals exposed to a given ambient concentration of xylene may absorb different amounts of xylene into their bodies as a result of their individual physiologies. Defendant then observes that none of plaintiffs' experts have given any estimate of the amount of xylene absorbed by Mr. Amorgianos and conclude that no causal opinion based on ambient concentration alone can be found to "fit" the evidence in this case.

As plaintiffs aptly put it, defendant's argument is a red herring. Virtually all of the studies submitted by plaintiffs, *see infra* Appendix tbls. 1–3, that describe dose at all, describe it in terms of the ambient concentration of the organic solvent in question, and it, therefore, appears that it is accepted practice in epidemiology and toxicology to measure dose in terms of ambient concentration in cases, such as those considered in these studies, where the study subjects' actual body burdens of the chemical in question have not or cannot be measured at the time of exposure. *See generally* Rom, *supra,* at 40 ("In most cases, doses and dose rates cannot be measured directly, and surrogate measures must be developed from data on exposures observed in the environment external to the worker. Exposure concentration or intensity is used as a surrogate for dose rate...."). While it may well be that different individuals absorb xylene and other chemicals at different rates, those absorption rates presumably fall into some well-defined distribution. As a result, the statistical results of studies involving large numbers of subjects will not be affected by such individual variations in absorption rate. Thus, such data does appear to be an accepted and acceptable basis for epidemiological hypothesis testing.

Moreover, defendant's insistence that plaintiffs should be required to demonstrate the actual amount of a chemical in a plaintiff's body would, in most cases, place an impossible burden on workers injured as the result of workplace exposure to toxic chemicals. The half-life of a given chemical in a person's blood may be only a few days or weeks, and the focus of a physician who treats a worker who has fallen ill on the job will be on the assess-

ment and treatment of the worker's illness, not on a forensic inquiry into the possible toxicological causes of the illness.[13] Consequently, in many, if not most, cases of illness related to workplace exposure to toxic chemicals, the tests necessary to determine the information that defendant demands will not be performed when the worker becomes ill, and, by the time such a worker initiates litigation, such tests will not be able to produce any useful information. Therefore, defendant's argument—that a causal hypothesis that is framed in terms of ambient concentration will not generally meet *Daubert's* "fit" requirement—must be rejected as contrary to both accepted epidemiological practice and sound legal policy.[14]

## 2. Caravanos's Opinion on Concentration

As far as the record reveals, no measurement of the concentration of xylene within the containment was ever made. Therefore, the concentration of xylene within the containment can only be estimated based on the amount of paint used, its xylene content, the volume of the containment and other environmental factors.

Plaintiffs have proffered Caravanos on the issue of concentration.[15] Caravanos,

13. As noted in the Agency for Toxic Substances and Disease Registry's toxicological profile on xylene:

> Laboratory tests can detect xylene or its breakdown products in exhaled air, blood, or urine.... However, a urine sample must be provided very soon after exposure ends because xylene quickly leaves the body. These tests are not routinely available at your doctor's office.

Agency for Toxic Substances & Disease Registry, U.S. Dep't of Health & Human Servs., *Toxicological Profile for Xylenes (Update)* (1995).

14. Certain overtones in defendant's argument appear to suggest that the failure to take into account an individual's rate of absorption of a particular chemical is also a defect in an opinion on specific causation. The suggestion is that, for all plaintiffs' experts know, Mr. Amorgianos may be a rare individual whose bodily defense mechanisms render him impervious to xylene. (*See, e.g.*, Def.'s Letter Br. at 5 (quoting Rutchik Dep. at 336 ("Q. Of the range, the 500 parts per million to 2,000 parts per million of xylene that you have *indicated is your opinion regarding exposure,* would you agree that, based on the body's defense mechanisms, that the amount of xylene, *if any,* absorbed by Mr. Amorgianos was not that range ... ?" (emphasis added))).) Defendant has not expressly moved to exclude plaintiffs' experts' opinions on specific causation, but if they had, plaintiffs' experts' failure to exclude the possibility that Mr. Amorgianos has such unusual physiological characteristics would not be a ground for finding their opin-

ion on specific causation unreliable. *Cf. Zuchowicz,* 140 F.3d at 390 (holding that plaintiff need not exclude every other possible cause of illness). Such speculative considerations—defendant has not conducted any tests on Mr. Amorgianos that would support the possibility, nor has it presented any evidence on the percentage of individuals who are resistant in such a manner to xylene—go to the weight of the opinion, not its admissibility. Consequently, the proper place for exploration of the possibility that Mr. Amorgianos has such a resistance to absorption of xylene would, instead, be on cross-examination or in any rebuttal opinion on specific causation that defendant wished to offer.

15. Although Dr. Rutchik's expert report includes certain estimates of the xylene concentration within the containment, Dr. Rutchik cites Caravanos for the underlying calculations. (Def.'s Letter Brief of 12/6/99, Ex. D, at 12.) In his deposition, Dr. Rutchik stated that he was not qualified to estimate the xylene concentration within the containment and that, in reciting estimates of concentration in his report, he was relying entirely on Caravanos's calculations and expertise. (*See* Rutchik Dep. at 302 ("It is not my expertise to do exposure calculations, nor do I have the ability to know the details of Dr. Caravanos' methods."); *id.* at 324–25 ("Q. Would it be fair to say ... that the exposure or dose information, relative to xylene, that is contained in your report, in part per million form, is exclusively the work of Dr. Caravanos? A. Correct."); *see also id.* at 302–325.)

who has authored a textbook on quantitative industrial hygiene used at a number of universities, (Tr. 6/18/98, at 7), performed a number of calculations prior to trial to arrive at an opinion on concentration, which he expressed at trial only by testifying that the concentration of xylene was in the "thousands" of parts per million ("ppm"), (*id.* at 40–41). After the trial, Caravanos revised his calculations, which come to the court in the form of a synopsis contained within Dr. Rutchik's expert report, and a graph and spreadsheets Caravanos supplied to Dr. Rutchik, which were introduced as exhibits at Dr. Rutchik's deposition. (Def.'s Letter Brief of 12/6/99), Ex. C (graph and spreadsheets); *id.* Ex. D, at 12 (Dr. Rutchik's Expert Report) (summarizing Caravanos's opinion on concentration). Caravanos's current opinion is that on days that spray-painting was performed within the containment, the xylene concentration increased in a linear fashion over the course of the workday from zero to 2,000 ppm. (*See id.*) Given the change in the concentration of xylene, so calculated, Caravanos now opines that at any given time Mr. Amorgianos was spray-painting he was exposed to a concentration of 500 to 2,000 ppm of xylene. (*See id.*)

Caravanos's calculations are simple and straightforward. Caravanos multiplied an estimate of the amount of paint used on an average workday by the percentage of xylene within the paint (as thinned) to arrive at an estimate of the amount of xylene released into the containment on an average workday. (Caravanos Dep. at 100–01.) Caravanos then divided the amount of xylene released by the volume of the containment to arrive at the concentration of xylene within the containment. (*Id.*) Caravanos assumed that the paint was applied and that xylene evaporated from the paint at a constant rate throughout the workday, and that all of the xylene in the paint had evaporated into the air by the end of the workday, where it remained sealed within the containment, which he assumed for the purposes of calculation was airtight. (Caravanos Dep. at 128–29, 141; Def.'s Letter Brief of 12/6/99, Ex. C (graph).)

There are a number of problems with Caravanos's calculations and his resulting opinion on concentration in terms of the evidentiary support (or lack thereof) for his underlying assumptions and in terms of whether he reliably applied his stated methodology. Some of these problems go to his opinion's weight and thus are properly tested on cross-examination. But others go to its reliability and, hence, its admissibility.

Before proceeding to an analysis of those problems, one non-issue must be set aside. Defendant has not proffered an opinion (by its own industrial hygiene expert or otherwise) on the concentration of xylene or any other organic solvent within the containment. Plaintiffs suggest that in absence of a rival opinion on the question, defendant's challenge to the reliability of Caravanos's opinion is improper. (*See* Pls.' Letter Brief of 12/15/99, at 2, 3.) The Second Circuit, however, has recently clarified that a party challenging the admissibility of its opponent's expert witness is not required to first use its own expert to call the challenged expert's testimony suf-

---

Accordingly, to the extent that plaintiffs are preferring Dr. Rutchik as an expert on xylene concentration, Dr. Rutchik's testimony on that issue is excluded.

Of course, if plaintiffs produce admissible evidence that the xylene concentration was in the amounts assumed in Dr. Rutchik's report, Dr. Rutchik may testify as to the health effects of exposure to such concentrations, provided his testimony is otherwise reliable. As discussed below, it is not. *See infra* Discussion (3)(E).

ficiently into question before a district court may analyze the admissibility of the challenged expert's testimony. *See Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91 (2d Cir.2000).

### a. Defects Going to the Weight of Caravanos's Opinion on Xylene Concentration

Each of the figures Caravanos entered into his calculations could be challenged as to their accuracy. First, Caravanos calculated the volume of the containment based on an estimate that the containment was 60 feet long, 55 feet wide and 10 feet high. (*See* Def.'s Letter Brief of 12/6/99, Ex. C (spreadsheet).) Caravanos did not derive these numbers from a measurement of the bridge itself. Instead, he examined an engineering diagram of the bridge included among the daily inspection reports prepared by KTA–Tator, Inc., an independent paint inspector contracted by Amtrak. (Caravanos Dep. at 111.) The diagram specifies the length of each span of the bridge as 120 feet and specifies that the distance from the bottom of the bridge's undercarriage to the street is approximately 22 feet. (*See* Def.'s Letter Brief of 12/6/99, Ex. J (KTA–Tator records).) No other dimensions are specified on the diagram, and the diagram does not indicate whether it was drawn to scale. (*See id.*)

Nonetheless, Caravanos assumed that it was drawn to scale, measured the distance marked as 22 feet on the diagram with a ruler, measured the height of the undercarriage as depicted on the diagram, then extrapolated from the two measurements of the diagram to arrive at an estimate of 10 feet for the height of the undercarriage, and hence the height of the surrounding containment. (Caravanos Dep. at 115.) The only evidence presented at trial as to the height of the containment was Ralph P. Romano's testimony that it was 15 to 18 feet. (Tr. 6/24/98, at 47.) Even if measurement of the bridge itself bears out the low end of Mr. Romano's testimony (i.e., 15 feet), then Caravanos's estimate of the containment's height would be too low by a factor of 10/15. Since, in Caravanos's formula (viz., concentration = mass of xylene / volume), concentration is inversely proportional to the volume of the containment, which, in turn, is directly proportional to its height, the resulting figure for concentration would be too high by a factor of 15/10, or 50%, based on that potential inaccuracy alone.

In addition, Caravanos estimated that the containment was 60 feet long (i.e., half the length of one span), based on a discussion with Mr. Amorgianos in which Mr. Amorgianos indicated the containment did not cover an entire span. (Caravanos Dep. at 114.) Mr. Amorgianos's testified at trial, however, that the containment was 75 to 100 feet long, (Tr. 6/17/98, at 41), and Mr. Romano testified that it was "about 100 feet long," (Tr. 6/24/98, at 47). Again, since, in Caravanos's formula, concentration is inversely proportional to volume and, hence, length, even if the low end of Mr. Amorgianos's testimony is accurate, then Caravanos's estimate of length was too short by a factor of $60/75$, and the resulting concentration too high by a factor of 75/60, or 25%, based on that inaccuracy alone.

If one combines the possible errors as to height and length, Caravanos's figure for concentration could be too high by a factor of at least $15/10 \times 75/60 = 1125/600$, or 87.5%. Both of these figures could have been determined precisely simply by measuring the bridge; Caravanos apparently made no attempt to do so.

In his current calculation, as evidenced by a spreadsheet he prepared after trial and which was introduced at Dr. Rutchik's deposition, Caravanos assumes that 25 gal-

lons of paint was used each workday. (Def.'s Letter Brief of 12/6/99, Ex. C.) Caravanos derives this estimate from a half-hour interview with Mr. Amorgianos. (Caravanos Dep. at 59–61, 117–18.) Invoices for the paint used on the Project might provide a more accurate estimate of the amount of paint used on the Project. Caravanos testified that those invoices were made available to him, (*id.* at 51, 79), but he relied on Mr. Amorgianos's estimate instead. This factor, again, goes to weight, since any discrepancy between the amounts suggested by the invoices and the 25 gallon estimate could be brought out on cross-examination.

The amount of xylene contained in the paint applied by Mr. Amorgianos, as actually thinned on the Project, is also in question. Caravanos estimated that the paint, as thinned, consisted of 10% xylene. (*See* Def.'s Letter Brief of 12/6/99, Ex. C (first spreadsheet).) To arrive at this figure, Caravanos began by noting the xylene content of the various paint products used on the Project:

(1) the first, primer coat (Con–Lux Zinc Plate 49 Type 2 Organic Primer Component A) consisted of 5% xylene by weight, and its corresponding thinner (Con–Lux Zinc Plate 49 Type 2 Organic Primer Component B) consisted of 29% xylene by weight, (*see id.*, Ex. M (Material Data Safety Sheets for the paints and thinners used on the Project));

(2) the white, intermediate coat was mixed from two components; one (Con–Lux Epolon Mastic 81 Aluminum Component A) consisted of 3% xylene; the other (Con–Lux Epolon Mastic 81 Reactor B) consisted of 5% xylene; the corresponding thinner (Con–Lux Epolon Reducer 145) consisted of 49% xylene (*id.*);

(3) the red, third coat and its corresponding thinners (Con–Lux Acrolon II), however, did not contain any xylene, (*id.*;

Tr. 6/18/98, at 52, 78 (Caravanos) (acknowledging that the red, third coat and its thinner did not contain any xylene)); and

(4) the fourth, anti-graffiti coat (Con–Lux Poly–Lon) also contained no xylene, (Def.'s Letter Brief of 12/6/99, Ex. M; Tr. 6/18/98, at 52, 78).

Since each paint was mixed with its corresponding thinner, Caravanos assumed that, with respect to the first two, xylene-containing coats, the resulting mixtures consisted of a percentage of xylene that lay somewhere between the percentage in the paint and the percentage in the thinner. (Tr. 6/18/98, at 71, 73, 77, 78.) Caravanos's choice of a final estimate of 10% for the first and intermediate coats appears to have been arbitrary; as Caravanos testified: "I decided instead of doing every single percentages [sic], the models for every single percentages [sic], to choose 10% xylene as a final sprayable primer and intermediate...." (*Id.* at 73; *see also id.* at 71.) Nonetheless, any inaccuracy introduced into the calculation thereby could presumably be challenged and quantified through testimony by the paint steward(s), who actually mixed the paint and thinner on the Project.

Finally, Caravanos assumed, for the purpose of his calculations, that the containment was absolutely air-tight and that, as a result, no xylene vapor escaped from the containment during the course of the workday. In deposition, Caravanos admitted that there may have been some seepage through the seams in the containment and its entryway. (Caravanos Dep. at 133–34.) Caravanos, however, testified plausibly that, given the containment's lead abatement function, it can be reliably assumed that the error introduced by this assumption was negligible. (*Id.*; Tr. 6/18/98, at 11–12.)

All of these possible inaccuracies bring out possible errors in Caravanos's concentration figure that are either approximately quantifiable or likely negligible. These possible errors are thus amenable to probing on cross-examination or through the presentation of contrary evidence and only go to the weight of his opinion.

**b. Defects Going to the Admissibility of Caravanos's Opinion on Concentration**

■ There is, however, another defect in Caravanos's concentration opinion whose magnitude could not readily be brought out on cross-examination and which goes directly to its reliability and, hence, its admissibility. An expert opinion is admissible only

> if (1) *the testimony is based upon sufficient facts or data*, (2) the testimony is the product of reliable principles and methods, *and* (3) *the witness has applied the principles and methods reliably to the facts of the case.*

Fed.R.Evid. 702 (emphasis added); *see also Kumho Tire*, 526 U.S. at 152, 153–57, 119 S.Ct. at 1176, 1176–79 (explaining that the objective of the *Daubert* gatekeeping requirement "is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," and excluding expert who did not follow his own stated methodology in forming his opinion). One fundamental assumption underlying Caravanos's calculations runs afoul of both of the emphasized requirements, i.e., it does not follow from a reliable application of his stated principles and methods, and it also contradicts plaintiffs' own evidence.

The model underlying Caravanos's calculation assumes that every single molecule of xylene within the paint (as thinned) was released from the paint as it left the sprayer and that every molecule of xylene that had been contained in the paint was in the air as of the end of the workday. (*See* Def.'s Letter Brief of 12/6/99, Ex. C (spreadsheet).) While this assumption certainly simplifies Caravanos's calculation, Caravanos has produced no justification for the assumption, either theoretical or empirical.

Caravanos explained in deposition that paint consists of two components: a solid fraction, viz., the pigment, and a liquid fraction that carries the pigment and makes it spreadable or sprayable, viz., the solvent. (Caravanos Dep. at 25, 77–78.) The process of paint drying is the process by which the liquid (solvent) fraction evaporates, leaving a solid layer of pigment behind. (Tr. 6/18/98, at 25, 75.) Caravanos testified at trial that the rate at which a solvent evaporates from paint (and, hence, the resulting concentration of solvent vapor in an enclosed space) depends on the volatility/vapor pressure of the particular solvent in question, temperature, humidity and "radiant energy", and that "proper exposure assessment" would include these variables. (*Id.* at 40–41, 75–76.)

However, as reflected on the spreadsheets introduced during his deposition and Dr. Rutchik's deposition, Caravanos did not include any of these variables in his calculations. (Def.'s Letter Brief of 12/6/99, Ex. C (spreadsheet).) Instead, he included only variables for the amount of paint used, its xylene content, and the volume of the containment, (*see id.*); in preparing his opinion, he considered the other variables, such as humidity, as "qualitative" factors. (Tr. 6/18/98, at 76 ("It was a qualitative factor that it was a dry day, so anything that evaporates would

evaporate more on a dry day.").) [16] This qualitative consideration is apparently the only basis for his assumption that the solvent evaporated from the paint completely as soon as it left the sprayer.

In addition to not being based on what Caravanos testified would be a "proper" calculation, this assumption contradicts evidence offered by plaintiffs as to the condition of the paint after it was applied. Specifically, Kpitikos testified that throughout the Project, the paint was unusually runny, (Tr. 6/23/98, at 25), thus indicating that a substantial amount of solvent remained in the paint after it was applied, i.e., that not all of the solvent evaporated from the paint immediately upon leaving the sprayer as Caravanos's calculation assumes. (See also Caravanos Dep. at 86 (stating that Mr. Amorgianos had told him the paint was "running and just not drying enough"); Tr. 6/18/98, at 73–74 (Caravanos) (noting that KTA–Tator inspection logs frequently indicated that the paint was runny).) Precisely or even approximately what degree of error Caravanos's simplifying assumption introduced into his final estimate of concentration cannot be determined without performing the very calculation that Caravanos testified should be done but which he omitted.

Because in preparing his opinion on concentration Caravanos did not follow the methodology that he testified was appropriate in his deposition (and hence did not apply his own stated methodology reliably) and, instead, based his calculation on an assumption that contradicts plaintiffs' own evidence as to the condition of the paint after its application (and hence did not

"base[ ] [his opinion] upon sufficient facts or data"), his testimony is excluded as unreliable. Fed.R.Evid. 702.

This latter defect in Caravanos's opinion on concentration appears to be one that he could remedy. Given his credentials in quantitative industrial hygiene, which have not been disputed, Caravanos could presumably perform the calculations necessary to estimate the evaporation rate of xylene and the other organic solvents from the paint used on the Project given the atmospheric conditions that existed on the relevant dates. Plaintiffs are, therefore, given leave to supplement Caravanos's expert report to include a calculation of concentration that includes a quantitative (rather than "qualitative") assessment of the temperature, pressure and humidity along the lines Caravanos testified would be included in a "proper exposure assessment," (Tr. 6/18/98, at 40–41, 75–76), but which Caravanos did not in fact perform.

Notably, plaintiffs argue that any error introduced into Caravanos's calculations are irrelevant because Caravanos testified at trial that even if his calculations were off by 90% or even 95%, his previously stated opinion that the concentration of xylene in the containment was "sky high" and "many, many levels above standard, acceptable levels," (id. at 40), would not change. (Id. at 109–10.) Plaintiffs' reliance on this testimony is misplaced: if Caravanos's calculation of 500 ppm to 2000 ppm of xylene were off by 95%, that would mean that the actual levels of xylene were 25 ppm to 100 ppm. Such an error would make a difference, for the OSHA PEL for

---

**16.** Data on these additional variables was available to Caravanos. As he noted in his deposition, the temperature, dew point, and humidity were recorded each day in the KTA–Tator logs. (Caravanos Dep. at 80.) When asked on cross-examination at trial why he did not include the additional variables he

cited as part of a "proper exposure assessment" in his calculation, Caravanos testified, "I—I did not find it necessary," adding, cryptically, "It was summer time, so I assumed the volatilization rate was going to be established." (Tr. 6/18/98, at 75.)

xylene is 100 ppm and Caravanos opined at trial that a person "could work at 100 part[s] per million all day long most of the time and not suffer any health effects." (*Id.* at 40–41.)

## B. Duration

■ On the issue of duration of exposure, plaintiffs have proffered Caravanos and Dr. Rutchik as experts. However, contrary to the apparent assumption of both plaintiffs and defendant, the issue of duration is not one for which the opinion of "a witness qualified as an expert by knowledge, skill, training, or education" "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

The duration of Mr. Amorgianos's exposure to xylene-containing paint products turns on three questions: (1) How many days was Mr. Amorgianos involved in painting inside the containment?, (2) Which paint products were used on each of those days?, and (3) How long was Mr. Amorgianos inside the containment on the days, if any, that he used the xylene-containing paints (viz., Epolon Mastic and Zinc Plate 49)? These are questions of fact about what actually transpired on the Project between July 22, 1995 and August 28, 1995; their determination does not require or benefit from Caravanos's expertise in industrial hygiene or Dr. Rutchik's expertise in neurology and toxicology. Moreover, neither Caravanos nor Dr. Rutchik has any direct, personal knowledge of Mr. Amorgianos's work activities on the Project, but instead have formed opinion about the duration of his exposure based on interviews with Mr. Amorgianos and reviews of time records and daily inspection reports for the Project.

To the extent these records require interpretation, none of the experts proffered by either party possesses the relevant expertise. For example, on the Romano time sheets, the notations "B," "P" and "S" appear beside the entries for the number of hours each crewman worked. Certain questions posed to Dr. Rutchik during his deposition suggest that these notations stand for "Blasting," "Painting" and "Spraying," and are intended to indicate what activity each particular crewman was performing on a given workday. The only witnesses qualified to explain the import, if any, of these notations are the individual(s) who prepared the records or any other Romano employee familiar with this notation system, provided some proof is made that it reflects a standard notation system used by the company. Accordingly, to the extent that plaintiffs are proffering Caravanos or Dr. Rutchik to testify on the duration of Mr. Amorgianos's exposure to xylene-containing paints, their opinions are excluded as falling outside the area of their expertise and otherwise outside their personal knowledge.

Although defendant correctly observes that an expert opinion on general causation must "fit" the facts of the case, including underlying facts regarding exposure, this last ruling does not mean that Caravanos or Dr. Rutchik (or Dr. Moline) cannot—for *this* reason—testify on the issue of general causation. In order for their opinions on general causation to "fit" the facts of the case, their opinions need only be "based upon sufficient facts or data." Fed.R.Evid. 702. Since the question of which paints Mr. Amorgianos was exposed to, on which days and for how long, are essentially ones of historical fact, an otherwise reliable general causation opinion will be admissible as long as it is predicated on assumptions regarding duration of exposure that a reasonable juror could find correct based on admissible evidence, such as Mr. Amorgianos's testimony or the time records and daily inspection reports.

As stated in their letter brief, plaintiffs now intend to offer general causation opinions that are predicated on an assumption that Mr. Amorgianos was spray-painting xylene-containing paints "on the three days prior to and including August 28, as well as intermittently during the 30 day period prior thereto." (Pls.' Letter Brief of 12/15/99, at 4.) Although Amtrak contests that Mr. Amorgianos himself was spray-painting on every day that any painting was done on the Project, Mr. Amorgianos's testimony, the time records and the daily inspection reports together provide sufficient evidence on which a reasonable juror could find that plaintiffs' claim as to the duration of Mr. Amorgianos's exposure to xylene-containing paint is correct. *See infra* Appendix tbl. 4 (summarizing the time records and daily inspection reports).

In addition, plaintiffs' current position on the number of hours Mr. Amorgianos spent painting on any given day that he painted at all also has sufficient support in the record. After noting in his report that Caravanos's concentration calculations were based on an eight-hour workday, Dr. Rutchik states: "[I]t is likely that Mr. Amorgianos was painting for closer to three to five hours per day and in the early part of the day. He may not have been in the enclosed space painting either before or after." (Def.'s Letter Brief of 12/6/99, Ex. D, at 12.) These assumptions are consistent with the KTA–Tator daily inspection reports, which, in some instances, record the start and stop times for the spray-painting on a given day, (*see, e.g., id.* Ex. J (KTA–Tator Daily Painting Inspection Report for 7/29/95, at 2) (noting that spray-painting began at 11:00 a.m. and ended at 2:00 p.m.)), and with trial testimony of various witnesses that a certain amount of time each work day was spent preparing to paint and on other non-painting activities.

Accordingly, to the extent plaintiffs' experts' opinions on general causation are based on an exposure duration of approximately 3 to 5 hours per day, on August 28, 1995, the three preceding days, and intermittent days in the preceding 30–day period,[17] *and to the extent they are otherwise competent and reliable,* those opinions are "based upon sufficient facts or data." Fed. R.Evid. 702.

(3)

Plaintiffs have proffered each of Dr. Moline, Dr. Rutchik and Caravanos on the issue of general causation, i.e., on the issue of whether exposure to xylene in the amount and for the duration allegedly experienced by plaintiff can cause the complex of CNS and PNS symptoms from which he allegedly suffers. Each of these experts bases his or her opinion principally on existing medical literature. As discussed above, Discussion (1)(B), Defendant's motion requires the court to determine whether these experts' conclusions regarding general causation were extrapolated from the medical literature in a scientifically reliable fashion. To do so, it is necessary first to specify more precisely the exact hypothesis that plaintiffs' experts are offering.

The issue in this case is not whether exposure to some organic solvent in some dose and for some duration can cause

---

**17.** To introduce a term that will sometimes be used below, such duration falls into the category toxicologists label as "subacute." *See Casarett & Doull's, supra,* at 15 (explaining that "acute exposure" refers to "continuous exposure for less than 24h;" "subacute exposure," to "repeated exposure to a chemical for 1 month or less;" "subchronic," to repeated exposure for one to three months; and "chronic exposure," to repeated exposure for more than three months).

some effect of some duration on the CNS and/or PNS. The issue is whether exposure to xylene in the amount and for the duration alleged by plaintiffs can cause CNS and PNS symptoms of the type, magnitude, and duration allegedly suffered by Mr. Amorgianos. The medical evidence on which plaintiffs' experts rely, of course, need not precisely match the specifics of this case in those respects, but it must at least be in the same ballpark.

In view of the fact that Mr. Amorgianos worked as a painter for twenty years, (see Tr. 6/17/98, at 37–38), it must be noted at the outset that plaintiffs are not claiming that Mr. Amorgianos had a pre-existing condition which was exacerbated or brought to a clinical level by his exposure during the Steinway Street Bridge Project. Plaintiffs themselves and their experts made clear in their trial and deposition testimony that they are attributing Mr. Amorgianos's alleged neurological conditions solely to his exposure during the Project: Mr. Amorgianos testified to a dramatic change in his health condition after August 28, 1995, (see id. at 95–96); Mrs. Amorgianos testified that before August, 1995, her husband had "never" become ill at work before, (id. at 129); and Dr. Moline testified based on Mr. Amorgianos's medical records that he "went to work fine in August," worked in an enclosed space with high levels of chemicals, and showed symptoms immediately thereafter, (see id. 6/18/98 at 132). Finally, plaintiffs' new expert on toxicology and neurology, Dr. Rutchik, put plaintiffs' causation claim in its starkest form:

> Q Is it your opinion that Mr. Amorgianos's present health is a result of his exposure to organic solvents for a period of time prior to his exposure at the [Steinway Street Bridge] project?
>
> A No.
>
> Q So is it your opinion that his exposure in this case is *exclusively* related to his exposure at the [Steinway Street Bridge] project?
>
> A. Yes.

(Rutchik Dep. at 203 (emphasis added).)

Accordingly, the hypothesis at issue here is that exposure to xylene in amounts averaging 500 to 2000 ppm on August 28, 1995 and each of preceding three workdays, and for three to five hour periods on intermittent days in the preceding thirty days can, as a general matter, cause the complex of CNS and PNS symptoms that Mr. Amorgianos alleges.

To inform the analysis of whether plaintiffs' experts have reliably extrapolated their opinions on this general causation issue from the medical literature they cite, it will be helpful first to review the relevant chemical and medical terminology used in the literature. The discussion will then turn to an analysis of each expert's opinion.

### A. Chemical Terminology

The term "organic solvent" identifies a general class of hundreds of chemical compounds that differ widely in structure and composition. Organic solvents as a class share only two characteristics: they are volatile (i.e., tend to evaporate rapidly on exposure to air) at room temperature and lipophilic.[18] *See* Roberta F. White & Susan P. Proctor, *Solvents and Neurotoxicity*, 349 Lancet 1239, 1239 (1997) (cited by

---

18. "Lipophilic" means "capable of dissolving, of being dissolved in, or of absorbing lipids." *Stedman's Medical Dictionary* 886 (25th ed., 1990). Lipids, in turn, are "[a]ny of a large class of organic substances, insoluble in water and typically greasy to the touch, including the fats, waxes, and sterols." *Funk & Wagnalls Encyclopedic College Dictionary* 788 (1968).

Dr. Moline). The most common organic solvents are aromatic hydrocarbons, such as benzene, toluene, and xylene, which are based on rings of six carbon atoms; aliphatic hydrocarbons, such as hexane, which are based on strings of carbon atoms of varying lengths; aldehydes, such as acetaldehyde, which are based on a carbonyl (CO) group that is bonded to a hydrogen atom and another hydrocarbon; alcohols, such as methanol and ethanol, which are based on hydrocarbon chains that include a hydroxyl (OH) group; esters, such as ethyl acetate; ethers, which consist of an oxygen atom bonded to two hydrocarbon chains; nitrohydrocarbons, such as ethyl nitrate; ketones, such as acetone and methylethylketone, which are based on a carbonyl (CO) group that is bonded to two other hydrocarbons; halogenated hydrocarbons, such as carbon tetrachloride and trichloroethylene (TCE); cyclic hydrocarbons, such as cyclohexane; and glycols, such as ethylene glycol, which are hydrocarbons containing two hydroxyl (OH) groups. *See id.* at 1239. The term "organic solvents" thus comprises a wide and varied class of compounds with few structural similarities to one another. *See id.*

The use of organic solvents is ubiquitous in industry. Organic solvents are used for a multitude of purposes, including degreasing machine parts, automobile manufacturing and repair, electronics manufacturing, dry cleaning, and the manufacture of paints, varnishes, and thinners. *See id.* Individual organic solvents and mixtures of various organic solvents are components of many products, including paints, varnishes, adhesives, glues, coatings, degreasing and cleaning agents, dyes and inks, floor and shoe polishes, waxes, agricultural products, and fuels. *See id.*

The particular organic solvent identified by plaintiffs' experts as the "primary cul-prit" in this case is xylene. Xylene, C6H4(CH3)2, consists of a benzene ring in which two of the hydrogen atoms attached to the central six-carbon ring have been replaced by methyl (CH3) groups.[19] Xylene comes in three isomers, or structural forms—*meta*-xylene (*m*-xylene), *ortho*-xylene (*o* xylene), and *para*-xylene (*p*-xylene), which differ from one another structurally, in terms of the relative position of the two methyl groups on the carbon ring, and chemically, in terms of physical properties, such as boiling point or freezing point. *See* Agency for Toxic Substances & Disease Registry, U.S. Dep't of Health & Human Servs., *Toxicological Profile for Xylenes (Update)* (1995). Most commercial preparations of xylene consist of a mixture of the three isomers. *See id.* Xylene in each of its three isomers is a colorless, flammable liquid with a sweet odor. *See id.*

Commercial xylene is derived from petroleum, and is one of the top thirty chemicals produced in the United States in terms of volume. *See id.* Xylene is used for a number of industrial purposes, including the manufacture of plastics, synthetic fabrics, and paper, as well as in the printing, rubber, and leather industries. *See id.* Xylene is also an ingredient in a number of commercial products, including industrial cleaning agents, airplane fuel, gasoline, and—most pertinent to this action—paints and paint thinners. *See id.* As noted previously, the primer and intermediate coats used on the Steinway Street Bridge Project and their corresponding thinners contained xylene in varying amounts, while the third, pigmented coat and the anti-graffiti coat, and their corresponding thinners did not contain any xylene. *See supra* Discussion (2)(A)(2)(a).

**19.** Xylene is also known as xylol, zylol, and dimethylbenzene.

## B. Medical Terminology

### 1. The Nervous System

The human nervous system has two components: the central nervous system (CNS) and the peripheral nervous system (PNS). *See Principles of Neural Science* 273 (Eric R. Kandel et al. eds., 3d ed.1991). The CNS, which consists of the brain and the spinal cord, is the locus of cognition, behavior, memory, and emotion, as well as the control of voluntary and reflex movements. *See id.* at 273, 275–78. The PNS consists of neurons and ganglia that lie outside the brain and spinal cord, and is responsible for carrying sensory information from the body to the CNS and for regulating the function of various internal organs and other internal bodily processes. *See id.* at 273–74.

### 2. WHO Classification Scheme for Toxically Induced CNS Disorders

As evidenced by the literature cited by plaintiffs' experts, the effect of organic solvents on the CNS (and PNS) function was, at least during the 1970s and 1980s, an area of interest to the medical community. In order to facilitate communication between, and to achieve some uniformity of diagnosis among, researchers and clinicians, a 1985 World Health Organization ("WHO") working group established a standard classification scheme for CNS symptoms suspected to be associated with workplace chemicals, including organic solvents, metals, and pesticides. *See* Edward L. Baker, *Organic Solvent Neurotoxicity*, 9 Ann. Rev. Public Health 223, 227 (1988) (cited by Dr. Moline); Edward L. Baker & Lawrence J. Fine, *Editorial, Solvent Neurotoxicity*, 28 J. Occupat'l Med. 126, 127 (1986) (cited by Dr. Moline).

The WHO classification scheme consists of five syndromes, or clusters of symptoms, some of which are acute and some of which are chronic in nature. Because the hypotheses discussed in the medical literature are often framed in terms of one or more of these five syndromes, it will be helpful to outline the WHO scheme. It must be borne in mind, however, that the WHO scheme is only a set of diagnostic categories, not a hypothesis that any particular chemical causes any of the diagnostic syndromes so described.

*Acute intoxication* can last for minutes to hours, with no residual effect. Symptoms include acute depression of CNS function and psychomotor impairment.

*Acute toxic encephalopathy* is clinically characterized by confusion, coma, and/or seizures. On a physiological basis, acute toxic encephalopathy may be caused by cerebral edema (i.e., "[a]n accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities,") *Stedman's Medical Dictionary* 489 (25th ed.1990), damage to the capillaries in the CNS, and hypoxia (i.e., oxygen starvation, *see id.* at 756), and its residual effects may include permanent cognitive deficits.

There are three chronic syndromes in the WHO classification scheme. *Organic affective syndrome* is characterized by mood disturbances, such as depression, irritability, fatigue and anxiety. It may last for days to weeks, but has no residual effects.

*Mild chronic encephalopathy* is characterized by fatigue, mood disturbance, and cognitive complaints. It has an insidious onset and may endure for weeks. Cognitive deficits may include attentional impairment, motor slowing or incoordination, visuospatial effects, and short term memory loss. Improvement may occur in absence of exposure, but in some cases permanent mild cognitive deficits may also occur.

Finally, *severe chronic toxic encephalopathy* is characterized by cognitive and

affective changes sufficient to interfere with daily living. Typical cognitive deficits are of the same types seen in cases of mild chronic toxic encephalopathy, but are more severe. Neurological abnormalities may be observed on some neurophysiological or neuroradiological measures, such as CT and MRI scans, electromyography, and electroencephalography. Severe chronic toxic encephalopathy has an insidious onset and results in irreversible, permanent cognitive dysfunction. *See* White & Proctor, *supra,* at 1241; Baker & Fine, *supra,* at 127 & tbls. 1–2.

### 3. Peripheral (Poly-)Neuropathy

Although the WHO workgroup focused on categorizing the potential cognitive and behavioral CNS effects of organic solvents and other workplace chemicals, a significant amount of research has also been directed toward the possible effects of organic solvents on the PNS and on the motor axons of the CNS, which originate in the spinal cord but run in the peripheral nerves, *see Principals of Neuroscience, supra,* at 250, 274. Of greatest importance to the present case is the question of whether organic solvents (including xylene) can cause peripheral neuropathy or peripheral polyneuropathy ("PN"). "Neuropathy" is a general term that denotes "any disorder affecting any segment of the nervous system," *Stedman's Medical Dictionary* 1048 (25th ed.1990), while "peripheral neuropathy" or "peripheral polyneuropathy" is a somewhat more specific term that denotes a "disease process involving a number of peripheral nerves," *id.* at 1236. PN usually affects both sensory and motor function. *See Principles of Neuroscience, supra,* at 250. Sensory disorders associated with PN include numbness, tingling, and phantom pains; in addition, sensitivity to touch, temperature, and vibration, may be decreased. *See id.* Typically, these effects are most pronounced at the extrem-

ities and manifest themselves in a characteristic, symmetrical "glove-and-stocking" pattern. *See id.;* Baker & Fine, *supra,* at 126. Motor disorders associated with PN are manifested by weakness and by decreased or absent reflexes. *See Principles of Neuroscience, supra,* at 250. PN can be caused by a wide variety of conditions, including genetic diseases, such as porphyria; Guillain–Barre syndrome; diabetes; vitamin B12 or thiamine deficiencies; lead poisoning; alcoholism; carcinomas; and certain immunological disorders. *See id.* In addition, as will be discussed at greater length below and in the Appendix, three workplace chemicals—methyl *n*-butyl ketone (M*n* BK), *n*-hexane, and carbon disulfide (which is not an organic solvent)—are generally accepted in the medical community as causes of PN. *See Casarett & Doull's Toxicology, supra,* at 471–74.

### C. Xylene's Acute Intoxicating and Eye Irritating Effects

Before proceeding with analyses of Dr. Moline, Dr. Rutchik, and Caravanos's opinions on general causation, one last nonissue must be addressed. To the extent plaintiffs' experts' opinions on general causation relate to the cause of the acute intoxication or eye irritation allegedly suffered by Mr. Amorgianos in the two- to three-day period following his departure from the Steinway Street Bridge Project, they are admissible. The articles relied upon by plaintiffs' experts, as well as the toxicology and industrial hygiene texts they cited as authoritative in their depositions, make abundantly clear that it is generally accepted in the medical community that exposure to xylene in the amount now alleged by plaintiffs—500 to 2000 ppm—even for periods of a few hours can cause eye irritation and the symptoms of acute toxic intoxication described by Mr. Amorgianos, viz., dizziness, nausea, loss of coordination, disorientation, and head-

aches, among others.[20] Moreover, xylene's acute narcotic effects and status as an eye irritant are two of the three adverse health effects relied upon by OSHA in formulating its PEL and STEL for xylenes (the other being adverse serological effects). *See* Air Contaminants, 54 Fed.Reg. 2332, 2477 (1989) (final rule amending 29 C.F.R. § 1910.1000). Thus, although neither party has focused on the issue of what caused the alleged acute health problems suffered by Mr. Amorgianos at the end of workday on August 28, 1995 and the subsequent few days,[21] there is clearly a reliable basis in the cited medical literature for plaintiffs' experts' opinions on general causation insofar as they relate to the symptoms of eye irritation and acute intoxication during the two- to three-day period following Mr. Amorgianos's departure from the Steinway Street Bridge Project. *See Daubert,* 509 U.S. at 594, 113 S.Ct. at 2797 (stating that "[w]idespread acceptance can be an important factor in ruling particular evidence admissible"). Accordingly, defendant's motion to exclude is denied with respect to that aspect of plaintiffs' experts' opinions on general causation.[22]

## D. Dr. Moline

■ Bearing in mind the factors discussed in *Daubert* and *Joiner,* as well as the relevant epidemiological principles sketched above, I have attempted to assess the support that the articles cited by Dr. Moline lend to her opinion, on both an individual and a cumulative basis. Only a brief review of the cited literature and a cumulative assessment appears here; an extended analysis of each individual article or work appears in a separate appendix following this opinion, *see infra* Appendix tbl. 1.

Upon review, the medical literature cited by Dr. Moline does not provide a reliable basis for her opinion on causation. Dr. Moline was asked in deposition to identify the articles on which she relied in forming her opinion. In an erratum letter to her deposition, she cited nine articles. (*See* Letter from Dr. Moline to Plaintiffs' Counsel of 3/10/98.) Three are cross-sectional studies (i.e., studies in which a group of randomly selected, exposed subjects is tested for various symptoms, with or without a reference group of unexposed subjects), two are uncontrolled case-series reports that examined exposed subjects who already presented the symptoms in question, and four are review articles, which summarize the results of existing studies. *See infra* Appendix tbl. 1.

20. Indeed, the acute intoxicating effects of xylene and other organic solvents will be familiar to anyone who has felt light-headed as a result of breathing fumes from paint thinner. As documented in an article cited by Dr. Rutchik, these effects are sufficiently well-known to the general public that it is not uncommon for individuals to inhale intentionally vapors from paint thinners or model glues that contain xylene or other organic solvents, such as toluene, in order to "get high." See Eugene D. Means et al., *Pathology of Lacquer Thinner Induced Neuropathy,* 5 Annals Clin. & Lab. Med. 240 (1976) (cited by Dr. Rutchik).

21. The parties presumably ignored this question because those acute conditions could not have accounted for any more than a tiny fraction of Mr. Amorgianos's damages in and of themselves.

22. This ruling is subject to the requirement that plaintiffs' introduce admissible expert evidence that the concentration of xylene within the containment was in excess of the OSHA PEL for xylene (100 ppm). If plaintiffs do not produce such evidence, then their experts' opinion on the acute aspect of Mr. Amorgianos's alleged illness will be excluded as well, for, as Caravanos testified, a person "could work at 100 part per million [of xylene] all day long most of the time and not suffer any health effects." (Tr. 6/18/98, at 40–41.)

The three cross-sectional studies-Fidler et al. (1987), Gregersen et al. (1984), and Seppalainen (1978)-each present serious problems of "fit" with the present case, in terms of the type of chemicals the subjects were exposed to, the duration of their exposure, and the resulting symptoms (or lack thereof). Fidler et al. (1987) studied 101 currently exposed workers, whose exposure was described simply as being to "paint," for an average of 18 years, as opposed to Mr. Amorgianos's intermittent exposure over a 38–day period. *See id.* While these authors found that the subjects reported a range of acute, subjective CNS symptoms (e.g., dizziness, nausea, fatigue, etc.), the authors conceded they were unable to associate the level of exposure with objective neurobehavioral deficits, and they did not study possible PNS effects at all. *See id.* Gregersen et al. (1984) studied 65 workers, only 10 of whom were painters, most of whom had never worn respirators, and who had been exposed to various organic solvents, primarily white spirit, perchloroethylene, toluene and styrene (rather than xylene), for an average of 12.9 years. *See id.* Although the authors again found a higher incidence of acute CNS effects in the exposed group, they found no statistically significant association between solvent exposure and peripheral neuropathy and declined to reach a conclusion as to whether the observed CNS effects were transient or permanent in nature, on the latter point citing the inherent limitations of a cross-sectional study design. *See id.* Finally, Seppalainen (1978) administered EEGs and EMGs to a group of 102 car painters who had been exposed primarily to a mixture of toluene, xylene, butyl actate and white spirit. *See id.* Although Seppalainen found support for an association between mixed solvent exposure and "slight" PNS effects, the subjects in her study were exposed for an average of 14.8 years. *See*

*id.* Moreover, she found no significant difference in the EEG results (CNS effects) for the painters as compared to the unexposed reference group. *See id.*

The two uncontrolled case-series reports, in addition to being epidemiologically weak evidence of a causal relationship, *see* Rom, *supra*, at 44–45, also fail to fit the facts of the case as alleged by plaintiffs. Morrow et al. (1989) administered the Minnesota Multiphasic Personality Inventory to 22 occupational medicine patients with an average of 7.3 years of exposure to unspecified organic solvents. *See id.* Linz et al. (1986) performed physical exams, blood tests, and neuropsychological evaluations on fifteen industrial painters, who were already seeking treatment for various neurological problems. *See id.* These patients had been exposed (without adequate protection or ventilation) to unspecified organic solvents for periods of 3–4 months to 24 years (as opposed to Mr. Amorgianos's intermittent exposure of a 38–day period). *See id.* The authors found a higher incidence of abnormal PNS and CNS symptoms in the 15 painter/patients as compared to general norms, but authors noted that they merely assumed that the patients results were normal before exposure and expressly "presum[ed]" that there was a causal relationship between their exposure and their neurological results. *See id.*

None of the four review articles discusses xylene specifically, and none provides any conclusion as to the dose or duration of exposure to any particular organic solvent required to produce chronic CNS or PNS effects. *See id.* Moreover, the underlying studies cited by the authors of these review articles reveal exposure histories very different from Mr. Amorgianos's. White & Proctor (1997) discussed the case of an individual with 32 years of exposure, including 30 years of

unprotected exposure to xylene, *and* benzene, toluene and methylethylketone (none of which were present in the paint products used on the Project). *See id.* Baker (1998) discusses studies involving individuals who were exposed to a variety of unspecified solvents for 9–10 years. *See id.* Baker et al. (1985) report PNS effects only with respect to *n*-hexane and M*n* BK, and, with regard to CNS effects, states only that symptoms consistent with toxic encephalopathy may appear after "heavy expos[ure] . . . over a period of months to years." *See id.* The ·authors do not report any conclusion as to the effect of exposures for a period of days to weeks, as alleged by Mr. Amorgianos. *See id.* Finally, Baker & Fine (1986) concluded that the acute intoxicating effects of organic solvents, generally, are well-established; that acute toxic encephalopathy, while a recognized effect of exposure to lead and mercury, "has not been described as a characteristic finding in excessive short-term solvent exposure;" that organic affective syndrome occurs in individuals with chronic solvent exposure (dose, duration, or particular solvent unspecified); and that the only convincing evidence of chronic toxic encephalopathy has come from studies of individuals who have deliberately abused solvent–containing products such as model glue.[23] *See id.* Baker & Fine (1986) further noted that no pathogenic explanation of the effect of solvent exposure on the CNS has been given and no dose-response relationship has been found. *See id.* With regard to PNS effects, they concluded that convincing evidence of "distal, *symmetrical* sensorimotor peripheral neuropathy has been clearly demonstrated following exposure of humans and animals to several specific solvents: n-hexane, methyl-n-butyl-ketone (MBK) and carbon disulfide" (emphasis added), but cautioned that the relationship between other solvents and specific agents has not been elucidated and noted that the rates of PNS toxicity in solvent-exposed groups have generally been lower than the rates of CNS toxicity. *See id.*[24]

23. By way of comparison, one of the articles cited by Dr. Moline states that glue-sniffing results in exposures of 50 to 100 times the PEL. See Anna Marie Seppalainen, *Neuropsychological Effects of Long–Term Exposure to a Mixture of Organic Solvents,* 4 Scand. J. Work Environ. & Health 304, 305 (1978). For xylene, this means an exposure of 5,000 to 10,000 ppm, a concentration far in excess of Caravanos's current upper estimate of 2,000 ppm exposure on Mr. Amorgianos's part.

24. The pathogenesis of n-hexane and M*n* BK-induced PN is well-understood. *See Casarett & Doull's, supra,* at 471. As explained in a toxicology text cited by Dr. Rutchik as authoritative, *n*-hexane and M*n* BK are both metabolized by the human body into 2,5 hexanedione. *See id.* at 471. That common metabolite in turn is the actual disease-causing agent. *See id.* 2,5 hexanedione reacts with the proteins that make up the cytoskeleton of axons, causing them to break in two. *See id.* at 470–71. Such breakage in the long axons that lead to the extremities results in the loss of sensation in and motor control of the extremities that characterizes PN. *See id.; see also Rom, supra,* at 701, 1095 (cited by Dr. Rutchik as authoritative) (same).

Interestingly, xylene is not metabolized by the body into 2,5 hexanedione, *see Hazardous Materials Toxicology* 1093 (John B. Sullivan, Jr. & Gary R. Krieger eds., 1992) (cited by Dr. Rutchik as authoritative) (noting that xylene is metabolized and excreted as methyl hippuric acid), and Dr. Moline candidly admitted at trial that she knew no biological explanation as to how xylene could cause the kind of axonopathy that underlies PN, (Tr. 6/18/98, at 133). Thus, to the extent Dr. Moline's opinion on general causation is based on the inference that *n*-hexane, M*n* BK and xylene are all organic solvents; n-hexane and MnBK are known to cause PN; therefore, xylene can also cause PN, her opinion is not supported by the cited literature. *Cf.* White & Proctor, *supra,* at 1239 (noting that the "toxicity of individual solvents to human beings *depends on the mechanism of action (which is usually related to their structure)* and the amount or dose of exposure" (emphasis added)).

In sum, none of the articles cited by Dr. Moline attributes clinical PNS effects to solvents other than *n*-hexane, M*n* BK, or carbon disulfide, and those that do find evidence only of a *symmetrical* peripheral neuropathy. None of the articles provides evidence on the CNS effects of short-term exposure to xylene or any other organic solvent, as opposed to long-term exposures of several months to many years. All involve individuals exposed to a variety of organic solvents (a) other than or in addition to xylene, (b) many of which were not present at all in the paint products Mr. Amorgianos used, (c) for a much longer period of time than Mr. Amorgianos. Only three of the studies evaluated a random cross-section of exposed subjects, the largest of which evaluated a group numbering only 102 subjects. *Cf. Washburn*, 2000 WL 528649, at *2, 213 F.3d 627 (holding that expert opinion was properly excluded where, inter alia, it relied on anecdotal reports and small-scale epidemiological studies with few controls). And none involved a follow-up study of even a majority of the subjects to determine whether the reported symptoms were permanent or transient.

Under these circumstances, there is too great an "analytical gap" between the conclusions reached by the authors of Dr. Moline's cited articles and the conclusions that she draws from their work, viz., that intermittent exposure to xylene at 500 to 2000 ppm for 3–5 hours per day, on intermittent days throughout a 38–day period can cause an *a* symmetrical peripheral neuropathy of permanently disabling severity, as well as cognitive and neurobehavioral deficits of disabling severity, which persist unchanged for a period of three years after cessation of exposure. The type and magnitude of the effect and the type and magnitude of exposure between which Dr. Moline posits a causal relationship are simply not in the same ballpark as the exposures and effects discussed in the cited literature and, therefore, cannot be reliably extrapolated from that literature. Further, in light of the studies and case histories cited by Dr. Moline, a case in which subacute workplace exposure to xylene caused the type of permanent, CNS and asymmetrical PNS conditions claimed by Mr. Amorgianos, would appear to be unusual and presumably would make for a publishable case history. Therefore, the fact that Dr. Moline, a specialist in occupational medicine, has chosen not to subject her assessment of Mr. Amorgianos's case to the scrutiny of her peers is particularly telling and constitutes an additional factor weighing in favor of exclusion. *See Daubert*, 509 U.S. at 593, at 113 S.Ct. at 2797. For all these reasons, defendant's motion to exclude Dr. Moline's opinion on general causation with respect to Mr. Amorgianos's alleged chronic PNS and CNS conditions is granted.

## E. Dr. Rutchik

■ Dr. Rutchik is a board-certified neurologist and has completed a clinical fellowship in neurotoxicology. (Rutchik Dep. at 307, 396.) Dr. Rutchik based his opinion on general causation on nineteen articles, including nine cross-sectional studies (three of which studied data from the same test group), two follow-up studies, two uncontrolled case-series studies, four case reports, one animal study, and one review article on the anatomy and pathology of the peripheral nerve. *See infra* Appendix tbl. 2.

The nine cross-sectional studies cited by Dr. Rutchik were all small in scale; the largest subject group studied consisted of 187 workers (Bleecker et al. (1991)). Moreover, the authors of the latter study found no signs of peripheral neuropathy and rejected the hypothesis that there was an association between chronic, low dose

solvent exposure and organic affective syndrome. As with the studies cited by Dr. Moline, each of these nine studies presents problems of "fit," both with respect to the type of exposure and effects reported. Most of these studies involved subjects who either were exposed to xylene in combination with other solvents not used on the Project or not exposed to xylene at all. Similarly, where specified, the studies involved subjects with mean durations of exposure of between 14.8 to 30 years. With regard to the effects of such long-term exposure, four reported subclinical CNS effects indicative of acute intoxication or organic affective syndrome, seven found subclinical PNS effects, and two found no evidence of any PNS effect at all. None reported evidence of chronic CNS conditions or peripheral neuropathy of clinical severity. None reported any asymmetrical PNS effects. And only one found a dose-response relationship between exposure and the observed symptoms; significantly, that dose-response relationship only emerged when workers with fewer than ten years of exposure were excluded, and the effect in question was "painter's syndrome" (i.e., organic affective disorder or neurasthenia), not peripheral neuropathy or chronic toxic encephalopathy (mild or severe). *See infra* Appendix tbl. 2.

The two follow-up studies, Antii Poika (1982) and Seppalainen & Antii Poika (1983), examined data from follow-up examinations of 87 of 106 patients diagnosed three to nine years earlier with chronic solvent intoxication after occupational exposure. As discussed in the later article, only 61% of these patients were exposed to xylene, and those that were were also exposed to a number of other solvents in larger quantities. The authors disclaimed

the ability to relate the observed PNS and CNS conditions to particular solvents. Moreover, the observed PNS and CNS effects were "slight" in degree, often with improvement "to a normal or almost normal state" over time. Finally, the authors found no dose-response relationship between solvent exposure and any PNS or CNS condition.

The two uncontrolled case-series reports, Seppalainen et al. (1980) and Linz et al. (1986), also do not "fit" the facts of this case, as alleged by plaintiffs. Seppalainen et al. (1980) studied 107 patients previously diagnosed as having suffered solvent poisoning after long-term exposure. The male subjects were exposed for an average of 9.6 years, and over half of the subjects were primarily exposed to the non-paint-related solvents trichloroethylene (a degreasing agent) and perchloroethylene (an ingredient in dry cleaning fluid). The authors found slightly abnormal EEGs (a CNS effect) and slowed nerve conduction velocities (a PNS effect), but no cases of actual paresis and no dose-response relationships.[25]

Given their anecdotal nature, the four case reports would for that reason alone probably not provide an epidemiologically reliable basis for an opinion on causation. *See* Rom, *supra*, at 44–45 (discussing the epidemiological significance of uncontrolled case studies and case-series reports). However, even leaving that general objection aside, none of them provides reliable support for Dr. Rutchik's opinion, and, indeed, they tend to illuminate the analytical gap between Dr. Rutchik's causal opinion and the types of exposures and effects reported in the literature. Morley et al. (1970) is one of the most-often cited articles concerning the acute intoxicating ef-

---

**25.** For a discussion of Linz et al. (1986), see the preceding analysis of Dr. Moline's opinion, *supra* Discussion (3)(D).

fects of organic solvents. In that case, three male workers began painting without respirators inside a tank in a ship's engine room at 10:30 a.m. The tank measured seventeen feet wide by seventeen feet long by four feet eight inches high and had virtually no ventilation. The workers lost consciousness while inside the tank and were not discovered until 5 a.m. the next day. The air inside the tank was estimated to contain 10,000 ppm xylene (i.e., five times Caravanos's current estimate of the upper bound on Mr. Amorgianos's exposure). One man died, showing signs on autopsy of liver damage and acute pulmonary edema; the other two men completely recovered with no residual effects two to three days later. Thus, despite 18.5 hours of continuous exposure to a much higher concentration of xylene than Mr. Amorgianos claims, no permanent effects were observed in the surviving Morley subjects.

Hipolito (1980), which was authored by a laboratory technician rather than a doctor or scientist, reports five cases of xylene poisoning in laboratory workers. The most severe case was that of a fifty-eight year-old woman who had worked with xylene for fifteen years in an unventilated, six by eight foot room. After eleven years she began to complain of, inter alia, headaches, nausea, dyspnea and flushes. After fifteen years, she collapsed with severe chest pain, did not work thereafter, and was only capable of limited self-care. Notably, the onset of these symptoms came after a much longer period of exposure than Mr. Amorgianos's (eleven years as opposed to thirty-eight days), and even then, the onset was insidious, as opposed to Mr. Amorgianos's claim of a sudden onset of permanently disabling CNS and PNS effects.

Means et al. (1976) reports the case of seven men aged seventeen to twenty-two years, who habitually and intentionally inhaled vapors from the same brand of lacquer thinner in order to "get high." These young men's solvent abuse resulted in a *symmetrical* peripheral neuropathy. Interestingly, despite the fact that the lacquer consisted of 43.6% xylene by volume, the authors attributed the PNS effects to a different ingredient, 2 heptanone, in view of its structural similarity to M$n$ BK, one of the three chemicals known to cause PN. Given that Means et al. declined to attribute the PNS effects they observed to xylene simply because it was the most prevalent solvent in the lacquer, it is highly questionable how Dr. Rutchik can reliably conclude from their work that xylene can cause PN. Cf. *Joiner*, 522 U.S. at 145, 118 S.Ct. at 518 ("Given that Bertrazzi et al. were unwilling to say that PCB exposure had caused cancer among the workers they examined, their study did not support the experts' conclusion that Joiner's exposure to PCBs caused his cancer.")

Finally, Klaucke et al. (1982) reports that fifteen employees at a hospital experienced headache, nausea, vomiting, dizziness, and eye, nose and throat irritation after xylene leaked into the hospital's ventilation system, resulting in an ambient xylene concentration estimated at 700 ppm. The authors reported that all of the patients' symptoms resolved within 48 hours, with no permanent effects noted.

The animal study cited by Dr. Rutchik, Padilla & Lyerly (1989), studied the effects on the axonal transport in rats that were exposed to varying concentrations of xylene for varying periods of time, from 50 ppm for a single 6 hour exposure, to 1600 ppm, 5 days per week, for 6 hours per day, for 1.5 weeks. A significant reduction in axonal transport was observed only at exposures of 800 ppm or 1600 ppm for 1.5 weeks. The rats were retested after thirteen days, with the 1600 ppm rats continuing to show decreased axonal transport.

The "analytic gap" between a reported effect on rat neurons, which lasted for thirteen days, and the conclusion that xylene can cause neuronal damage in humans that persists for three years or more is simply too great for the resulting opinion to be reliable.

Finally, the review article on the anatomy and pathology of peripheral nerves, Schaumburg & Spencer (1976), is expressly limited to three solvents other than xylene, viz., n-hexane, Mn BK and 2,5 hexanedione.

In sum, as is the case with the medical literature cited by Dr. Moline, Dr. Rutchik's cited articles fail to "fit" the facts of this case, either in terms of the type and duration of exposure, or the type and duration of the observed effects. The articles cited by Dr. Rutchik involved subjects with years of exposure to a variety of solvents other than, or in combination with, xylene, and the observed symptoms were either those of acute intoxication; or subclinical or subjectively symptomatic PNS and CNS effects, with little evidence that such effects are permanent. Few, if any, dose-response relationships were reported, and none of the studies or case reports report cases of asymmetrical peripheral neuropathy. *See also Hazardous Materials Toxicology, supra,* at 149 (cited by Dr. Rutchik as authoritative) ("Toxic neuropathies commonly present with clinical patterns of symmetrical polyneuropathy...."). Moreover, Dr. Rutchik prepared his opinion for litigation, rather than as part of his academic research, and he has not seen fit to share his opinion that intermittent exposure to xylene over a 38 day period can cause CNS and asymmetri-

cal PNS deficits of permanently disabling severity. For all these reasons, defendant's motion to exclude Dr. Rutchik's general causation opinion with respect to Mr. Amorgianos's alleged chronic conditions is granted.

## F. Caravanos

### 1. Xylene

 In deposition, Caravanos acknowledged his estimates of xylene concentration might not be accurate, but explained that even if the actual levels were substantially lower, his opinion on causation would remain the same. When asked what is the minimum level of exposure necessary to cause the chronic effects alleged by Mr. Amorgianos, Caravanos responded that "one day exposure to 500 parts per million of xylene is possible to see the effects that Mr. Amorgianos has." (Caravanos Dep. at 162.) When asked on what basis he had reached that conclusion, Caravanos cited six article abstracts and the documentation accompanying the American Conference of Governmental Industrial Hygienists' ("ACGIH") published threshold limit value ("TLV") for xylene.[26]

At the outset, it should be noted that Caravanos did not actually read a single article as part of his literature survey. Rather, with the exception of the ACGIH TLV documentation, he only read abstracts of articles retrieved from computer searches of MEDLINE and other medical databases. The court has grave doubts as to whether this constitutes a reliable methodology for researching medical evidence in support of an opinion on causation. While reading abstracts, no doubt, plays a role in medical research, presumably that

---

**26.** The AGCIH publishes its own recommendations for the maximum exposure limits for various industrial chemicals, using the term "threshold limit value." Like OSHA's PELs, AGCIH TLVs are recommended maximum time-weighted average exposure limits over the course of an eight-hour workday. The AGCIH TLV for xylene is the same as OSHA's PEL for xylene, viz., 100 ppm.

role is simply to identify articles that are worth reading in full in much the same way that headnotes and annotations are used in legal research. It is a place where research starts, not where it ends. The synopsis of a medical article given in its abstract will, of necessity, fail to include details regarding the methodology and conclusions of the summarized study that may attenuate or even destroy its relevance to the issue in question.

The present decision to exclude Caravanos's opinion on general causation, however, is not based exclusively on his disturbingly cursory research, for a review of the abstracts themselves reveals that they lend no support to his conclusions on the causal connection between acute or subacute exposure to xylene or other organic solvents and the chronic CNS and PNS symptoms alleged by Mr. Amorgianos. These articles all relate either to acute intoxication or eye irritation, or to substances other than xylene. *See infra* Appendix tbl. 3.

When asked how he extrapolated his conclusion regarding chronic effects of acute or subacute xylene exposure from these abstracts, Caravanos stated that he analogized from the fact that single, high dose exposures to other chemicals, such as lead, can cause irreparable damage to the body. (*See* Caravanos Dep. at 196.) As an industrial hygienist, Caravanos is, no doubt, qualified to testify to health risks associated with particular workplace chemicals that are generally accepted in the medical community; his profession requires such expertise. However, as is apparent from the foregoing review of the medical literature cited by plaintiffs' experts, the hypothesis that acute or subacute exposure to xylene can cause permanent CNS and PNS deficits has not obtained such status in the relevant scientific communities. Instead, plaintiffs'

general causation hypothesis lies at the frontier of toxicological research, and Caravanos—who is not a medical doctor, is not a toxicologist, is not a neurologist, and is not a biochemist, (*see id.* at 5–14, 20–21)—is simply not qualified to reliably extrapolate from what a single dose of lead can do to the body to what a single dose of xylene can do to the body. His extrapolation is, therefore, only that of an educated layman. It is not offered by "an expert [qualified] by knowledge, skill, experience, training, or education," Fed. R.Evid. 702, and it will not assist the jury in determining the issue of causation in this case.

The only remaining basis of Caravanos's opinion on general causation, then, is the temporal connection between Mr. Amorgianos's alleged exposure in this particular case and his alleged onset of chronic CNS and PNS symptoms. (*See* Caravanos Dep. at 198–200.) However, no reliable conclusion on general causation can be drawn from a temporal connection in a single, anecdotal case. *See Washburn,* 2000 WL 528649, at *2, 213 F.3d 627 (citing *Cavallo v. Star Enter.,* 892 F.Supp. 756 (E.D.Va. 1995), *aff'd in relevant part,* 100 F.3d 1150 (4th Cir.1996); *Conde v. Velsicol Chem. Corp.,* 804 F.Supp. 972, 1023 (S.D.Ohio 1992), *aff'd,* 24 F.3d 809 (6th Cir.1994)).

For all the foregoing reasons-the lack of support in the cited medical and industrial hygienic literature, the fact that Caravanos did not read those articles, his lack of the educational qualifications necessary to make an extrapolation from the effects of lead and other substances on the body, and his reliance on temporal connection, as well as the facts that Caravanos has done no research of his own on the effects of xylene on the human nervous system, (Caravanos Dep. at 19), and that he developed his opinion for the purposes of litigation and has not subjected that opinion to the

scrutiny of peer review, (*id. passim*)—Caravanos's opinion on the chronic effects of acute or subacute xylene exposure is neither competent nor reliable and is, therefore, inadmissible under Rule 702.

### 2. Propylene Glycol Monomethyl Ether

In his deposition, Caravanos opined that propylene glycol monomethyl ether ("PGME") may have also contributed to the causation of Mr. Amorgianos's alleged illness, though, in his opinion, xylene was "probably the dominant factor." (*Id.* at 150–152.) Caravanos's suspicion regarding PGME appears to be based on the fact that one of the thinners used on the project, Epolon Reducer 145, consists of fifty-two percent PGME. (*See id.* at 77.) However, there is not a single reference to PGME, or any other ether, in the abstracts cited by Caravanos. *See infra* Appendix tbl. 3. Caravanos's methodology with respect to his PGME general causation opinion, therefore, appears to be based solely on post hoc ergo propter hoc reasoning that Mr. Amorgianos became ill, PGME was present in the paint products he used, hence PGME can cause such illness. Again, a causal opinion based solely on a temporal connection between exposure and onset of illness in a single case is not epidemiologically reliable. *See Washburn*, 2000 WL 528649, at *2, 213 F.3d 627. Caravanos's opinion on PGME is, thus, an ipse dixit in its purest form. Accordingly, to the extent that Caravanos intends to testify at trial that PGME, or PGME in combination with xylene, can cause the types of chronic neurological problems plaintiffs allege, his opinion on the issue is also excluded under Rule 702.

### G. Summary

As was noted at the outset of this section, the issue here is not whether exposure to some organic solvent in some amount and for some duration can cause some adverse CNS or PNS effect. The primary focus in the preceding evaluation of plaintiffs' experts' opinions has, therefore, been whether the types of exposures and the types of symptoms reported in the literature cited by plaintiffs' experts are sufficiently similar to the facts of this case to make their opinions on general causation in this case reliable. The articles cited by plaintiffs' experts do support an association between long-term exposure to a variety of organic solvents (not necessarily including xylene) and certain symmetrical, clinically testable, but subjectively unnoticeable sensory or motor deficits and neurasthenic conditions, whose onset is insidious and whose permanence is unknown. However, from these articles, plaintiffs' experts extrapolate to the conclusion that subacute exposure to high doses of xylene in particular can, as a general matter, cause sudden, permanent sensory and motor deficits of crippling severity and asymmetrical distribution, as well as disabling cognitive and behavioral effects, that can persist unchanged for three years or more. On these facts, there is simply too great an "analytical gap," *Joiner*, 522 U.S. at 146, 118 S.Ct. at 519, between the studies on which plaintiffs' experts rely and the conclusions they draw from those studies for their opinions to be reliable.

Moreover, with the exception of Dr. Moline, who treated Mr. Amorgianos prior to this litigation, each of plaintiffs' experts developed this hypothesis in the course of this litigation. And none of plaintiff's experts, including Dr. Moline, have since tested this hypothesis in any way or subjected it to peer review. Instead, plaintiff's experts have aired their hypothesis only in the courtroom and have elected not to share their ideas on this subject with their peers in the medical and industrial hygienic communities.

For all these reasons, the methodology employed by plaintiffs' experts (i.e., extrapolation from existing studies) has not been reliably applied in this case. Accordingly, their opinions are not based on "scientific … knowledge" and will not assist the jury in determining the issue of causation in this case. The expert testimony of Dr. Moline, Dr. Rutchik, and Caravanos on general causation as it relates to Mr. Amorgianos's alleged chronic illnesses will, therefore, be excluded under Rule 702.

In closing, it must be stressed that no judgment is made here as to the genuineness of any of plaintiffs' experts' opinions in this case. Rather, the ground for their exclusion is that, in light of the foregoing considerations, their opinions ultimately appear to be speculative. The surmise and conjecture of an expert, however, no matter how good his or her credentials, is still only that—surmise and conjecture, not admissible evidence.

### Conclusion

Defendant's motion to exclude plaintiffs' experts under Rule 702 is granted in part and denied in part.

Defendant's motion is granted in the following respects: (1) Caravanos, Dr. Moline and Dr. Rutchik will not be admitted to testify on the issue of general causation with respect to Mr. Amorgianos's alleged chronic neurological conditions; (2) Caravanos and Dr. Rutchik will not be admitted to testify as experts on the issue of the duration of Mr. Amorgianos's alleged exposure to xylene and other organic solvents; and (3) Caravanos will not be admitted to testify on the issue of the concentration of xylene or other organic solvents in the containment.

Defendant's motion is denied in the following respects: (1) Caravanos, Dr. Moline and Dr. Rutchik will be admitted to testify on the issue of the cause of Mr. Amorgianos's alleged eye irritation, nausea, fever, and other acute health conditions in the two- to three-day period after he ceased work on August 28, 1995, *provided* plaintiffs produce admissible expert evidence that the concentration of xylene in the containment on August 28, 1995 exceeded the OSHA PEL; and (2) plaintiffs may present otherwise admissible expert opinion evidence that is based on the estimated duration of Mr. Amorgianos's exposure to xylene and other organic solvents stated in plaintiffs' letter brief.

Because plaintiffs have not produced admissible expert evidence on the issue of general causation with respect to Mr. Amorgianos's alleged chronic illness and thus cannot sustain their burden of proof as a matter of law, defendant is hereby given leave to move forthwith for partial summary judgment on Mr. Amorgianos's claims with respect to his alleged chronic illness and his wife's derivative loss of consortium and services claim.

Finally, because the deficiencies in Caravanos's expert opinion as to the concentration of xylene appear to be ones that could potentially be remedied, plaintiffs are given leave to supplement Caravanos's expert report with respect to concentration. If plaintiffs elect not to do so and elect not to proffer an alternative expert opinion on the issue of concentration, defendant will be given leave to move for summary judgment on Mr. Amorgianos's remaining claims.[27]

### Appendix

Table 1 Literature Cited by Dr. Moline

---

**27.** See *supra* note 22 and accompanying text.

| Article | Type | Subjects | Substance | Duration and/or Dose | Symptoms Described or Tested | Authors' Comments and Conclusions | Supports Conclusion that Subacute Exposure can Cause Chronic CNS or PNS Effects? |
|---|---|---|---|---|---|---|---|
| R.F. White & S.P. Proctor, *Solvents and Neurotoxicity*, 349 The Lancet 1239 (1997). | Review article | Cites one case example. 50-year old glazier with 32 years of exposure to benzene, toluene, zylol (xylene), and methylethylketone, who had never used respirator and had only been using gloves for past two years. Suffered from PN and variety of cognitive and mood problems. Subject had noticed mood changes for "some years" prior. One year later, patient reported "remarkable improvement" in mood and sensory awareness, though cognitive (short-term memory) deficits and mood effects remained. Two years later, cognitive deficits remained. | Organic solvents generally | Unspecified | Discusses WHO classification scheme for solvent-related CNS disorders | Effects on CNS and PNS of solvents are generally fleeting and resolve after exposure, but in some cases long-term chronic exposure or high-dose acute exposures can cause permanent damage | No. Does not address xylene specifically. Does not discuss the duration or dose expected to produce the symptoms described, or associate particular symptoms with particular solvents.<br><br>Only case example noted presents very different exposure history—32 years of unprotected exposure to a variety of organic solvents other than xylene. |
| Edward L. Baker, *Organic Solvent Neurotoxicity*, 9 Ann. Rev. Public Health 223 (1988). | Review article | N/A | Organic solvents generally | 9–10+ years | PN, CNS (memory, mood) deficits. | Pathogenesis best understood with respect to n-hexane and methyl n-butyl ketone, these toxins can cause a distal axonopathy resulting in *symmetrical* distal sensory loss and weakness.<br><br>"[E]pidemiological studies to date confirm the occurrence of dose-related impairment in central-nervous-system dysfunction among individuals chronically exposed to a variety of organic solvents. . In some cases, deficits appear to persist for significant periods after exposure ceases." | No. Studies cited in support of conclusions with respect to chronic exposure involve individuals with 9–10 or more years of exposure to a variety of solvents. Does not discuss the effects of short-term exposure (3–30 days) to xylene or any other organic solvent. |
| A.T. Fidler et al., *Neurobehavioural Effects of Occupational Expo-* | Cross sectional study with control group using self-reported ques- | Subjects: 101 currently exposed construction and maintenance | Paint | 101 painters worked an average of *18 years*, with 30.6 weeks | See next column. | Consistent positive association was observed between most measures of | No. Authors conceded they were unable to associate various expo- |

| Citation | Study type | Subjects | Exposure | Exposure measure | Results | Comment |
|---|---|---|---|---|---|---|
| sure to Organic Solvents among Construction Painters, 44 Brit. J. Ind. Med. 292 (1987) | tionnaires and "eight tests of a computer administered neuro-behavioral evaluation system." | painters | | of work in the last year, and 13 days of work in the last month. Used an exposure index based on rates, frequency, painting method, use/nonuse of respirator, ventilation. The resulting index was intended to measure "average lifetime paint use." | exposure and the occurrence of neurotoxic symptoms, notably dizziness, nausea, fatigue, problems with arm strength, and feelings of getting "high" from chemicals at work. Associations with exposure were found with the neurobehavioral evaluation system tests of symbol digit substitution and digit span; however, no consistent pattern of effect on neurobehavioral function was observed. This pattern of neurotoxic symptoms without clear evidence of function deficit is consistent with the type 1 toxic CNS disorder [organic affective syndrome] as classified by WHO (as opposed to WHO type 2 [mild chronic toxic encephalopathy] and WHO type 3 [severe chronic toxic encephalopathy]. Authors conceded their "inability to demonstrate" the hypothesized effects on neurobehavioral function. | sure indices with objective neurobehavioral deficits. Range of acute symptoms was reported, but study did not indicate whether these were symptoms felt during work or after work, and average respondent had worked for 13 days in last month, and 30 weeks in last year, i e , currently exposed painters. Authors did not study PNS effects. |
| | | Controls: 31 dry wall tapers<br><br>Attempted to control for alcohol, nicotine, caffeine consumption as well as lead exposure.<br><br>Authors ultimately discarded the control group results because the two groups were found not to be sufficiently comparable in age, education and alcohol consumption to permit meaningful comparison | | | | |
| Lisa A. Morrow et al., A Distinct Pattern of Personality Disturbance Following Exposure to Mixtures of Organic Solvents, 31 J Occupat'l Med. 743 (1989). | Uncontrolled case-series report. | Subjects: 22 occupational medicine patients, without prior history of neurological or psychological disorder. | Unspecified mixture of organic solvents | Mean length of exposure was 7.3 years (SD = 6.5 years) Dose unspecified. See next column. | 20 of 22 men showed scale scores that deviated by two standard deviations from the norm. After performing a regression analysis, authors found a statistically significant association between duration of exposure and MMPI scores corresponding to mental confusion, feelings of alienation, unusual thoughts and psychological turmoil. No significant differences were found between the scores of patients who had suffered at least one "high dose" accidental exposure and | No. The workers involved in the study had been exposed for mean of 7.3 years and had been exposed to a variety of solvents, including, as the reported case history indicates, solvents, such as TCE, that are not ingredients in paint. In addition, the fact that there was no significant difference between the scores of workers who had one or more high-dose exposures and those who had none, indicates that the causal factor at work, if any, is duration of chronic exposure, |

those who had not. And no dose-response relationship was found between duration of exposure and MMPI scores for the depression scale and no significant association for the social withdrawal or social introversion scales.

not the occurrence of acute exposures, such as those alleged by plaintiffs. Finally, the small size of the study group and the fact that it was composed entirely of subjects who had already presented with clinical symptoms rather than a representative cross-section of exposed workers further attenuates the weight of the results obtained. *See Reference Manual, supra,* at 138–39.

Administered the Minnesota Multiphasic Personality Inventory (MMPI).

One case history reported: 42–year old machine maintenance operator who had been exposed primarily to trichloroethylene (TCE), a degreasing agent, for 14 years, 3–4 times a week, 3–4 hours at a time in a *closed shop* without gloves. The man had first begun feeling "strange" while he was working around TCE and reported trouble sleeping, incoordination, visual disturbances, personality changes and depression

P. Gregersen et al., *Neurotoxic Effects of Organic Solvents in Exposed Workers,* 4 Am. J. Ind. Med. 201 (1984)

Cross-sectional study with control group. Aimed at determining dose/response relationship for CNS and PNS effects.

Subjects: 65 Danish workers currently exposed to organic solvents (10 painters, 10 dry cleaners, 33 film developing, 12 polyester boat builders)

Primarily white spirit, perchoroethylene, toluene and styrene.

Mean exposure: 12.9 years (SD = 9.5 years). Degree of evaporation, marked; ventilation, moderate, 73.1% of work was with inadequate ventilation; frequent possibility of skin absorption; ⅘ never wore masks.

Tested for acute symptoms (fatigue, dizziness, memory loss, sleep disorder, mood changes, etc.) and objective signs (muscle strength, reflex, coordination, gait, diadochokinesis, motor signs and symptoms of PN (1 to 8 scale), vibratory thresholds, touch and pinprick tests; psychological tests for learning/ memory, concentration, abstraction.

Exposed workers had more symptoms of intellectual impairment, poorer performances in psychological tests, and more often signs of cerebral astenopia [a disturbance of the visual function caused by organic brain damage]. *"Symptoms and signs of peripheral neuropathy occurred more frequently in the exposed workers who also had a generally higher VPT, but the differences were not statistically significant"* Solvent exposure and neurotoxic signs and symptoms were mildly correlated in the study group. Such dose-effect correlations have previously been proved only in a few epidemiological studies. This warrants reevaluation of the risk of developing toxic encephalopathy during *prolonged* exposure to solvents.

No. Authors found no statistically significant association between solvent exposure and PN. Acute CNS effects (dizziness, mood changes, cognitive deficits) were observed in currently exposed workers, but authors declined to reach a conclusion as to whether such effects were irreversible or transient, citing the inherent limitations of a cross-sectional study.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Tests were conducted in the workplace. | Controls: 33 unexposed electricians and warehousemen. | | | | | After correction for age, alcohol and head injuries, there was a significant correlation between exposure and the combined neurological and neuropsychological findings. But there was no significant correlation between exposure and neurological findings alone, or exposure and neuropsychological findings alone. | In addition, there are two major problems of fit between the Gregersen study and the facts of this case. First, the mean duration of exposure for the study subjects was 12.9 years, whereas plaintiffs are claiming intermittent exposure over a course of five weeks. Second, only ten of the sixty-five study subjects worked with paint. Moreover, those ten were exposed primarily to white spirit—not xylene—in an amount estimated at three to four times the TLV. The study group also included ten dry cleaners who were exposed primarily to perchloroethylene, thirty-three film developers who were exposed primarily to toluene, and twelve boat factory workers who were exposed primarily to styrene. |
| Long term effect and acute effect tested. Acute effect measured by testing workers after 40 hours of nonexposure on Sunday and then again at the end of work on Thursday. | Groups were comparable in age, history of brain traumas and neurological diseases, and alcohol consumption. | | | | | "As in other cross-sectional studies, it is not possible to state with absolute certainty that the demonstrated neurological and neuropsychological signs and symptoms manifest a chronic condition or whether they are reversible." | |
| Douglas H. Linz et al., *Organic Solvent–Induced Encephalopathy in Industrial Painters*, 28 J. Occupational Med. 119 (1986) | Uncontrolled case-series report | 15 industrial painters in Oregon *who had come to clinic for treatment* (not a random cross-section). | Variety of organic solvents | Work site A: 3 factory workers who had used new paint booth with ventilation defect. One worker had 5 years of exposure. the other 2 had 3–4 months of exposure. Each had 5–8 weeks of exposure in the defective paint booth. 2–3 months since last exposure at time of examination. | Subjective symptoms' between painters and non-painters, significantly more chronic cough, headache, dizziness, sleep disturbance, decreased coordination, abnormal taste or smell, personality change, decreased memory. | Results of this study confirm the *existence* of chronic encephalopathy in organic solvent-exposed painters. Five painters had sensorimotor peripheral neuropathy ... This toxic encephalopathy ... was *presumably caused* by organic solvent exposure rather than some other factor associated with industrial painting. | No. Authors relate case reports on existence of conditions in painters with exposures of 3–4 months to 24 years, who had already presented themselves for treatment. Authors only presume the causal connection. Does not specify the diagnoses of the two patients with short term exposure (3–4 months). |
| Physical exams, blood tests, neuropsychologic evaluation. | | Painters were compared with "control group" of 30 non-painter workers/patients with respect to subjective symptoms. | | Work site B. Factory Paint booths with inadequate ventilation. Air supply respirators used only for 1–2 years before exam. 4 workers with 4–13 years of exposure, and 4–30 months since last exposure | Physical exam: mild distal neuropathy with reduced two-point discrimination in 3/5 painters (does not indicate which ones). | | |
| Baseline performance of group on neuropsycho- | | | | Work site C. Factory. Paint booths with poor ventila- | Cognitive, sensory and motor deficits in compari- | | |

logical tests was assumed to be average (e.g., IQ=100), authors assumed that the painters were not below or above the average of the general population.

tion, poorly fitted respirators with insufficient filter changes. Air supply respirators only used for last 1–2 years. 8 workers with 3.4 to 24 years exposure, and 2–32 months since last exposure. Ambient concentration of solvents at the work sites was not measured.

son with general norms. Mood problems. "Seven painters [authors do not say which] underwent evaluation for rehabilitation at another institution approximately 1 year after the initial evaluation and in the absence of further organic solvent exposure. At that time clinical neurologic examinations were normal in all subjects, but four manifested cognitive impairment and one was regarded as unusually mentally slow. Abbreviated neuropsychologic tests showed that all had impairment of visual-spatial perception, regulatory function, short-term memory, abstraction ability, and motor skills."

| Edward L. Baker et al, *The Neurotoxicity of Industrial Solvents: A Review of the Literature*, 8 Am. J. Ind. Med. 207 (1985). | Review article | N/A | Various organic solvents | "[H]eavy expos[ure] over a period of months to years." | See next column | "In summary, existing studies indicate the occurrence of defined syndromes of peripheral neuropathy and toxic encephalopathy that occur in individuals *heavily exposed to solvents over a period of months to years.* An important recent study of individuals chronically exposed below the TLV failed to demonstrate significant nervous system impairment. *Peripheral neuropathy* occurs as a result of axonal degeneration *caused by* exposure primarily to the hexacarbon solvents *n-hexane and methyl n-butyl ketone.... [F]urther research is necessary to evaluate the potential for peripheral neurotoxicity in groups exposed to solvents other than n-hexane or methyl n-butyl ketone.* The accumulated evidence supports the occurrence of a syndrome of toxic encephalopathy caused by excessive exposure to organic solvents in trades such as painting and boatbuilding. This syndrome is characterized by memory disturbances, impaired psychomotor function, impaired verbal | No. Authors only associate PN with MnBK and n-hexane, not xylene or other organic solvents. Supports toxic encephalopathy (CNS) with onset after "periods of excessive exposure," but does not specify the necessary dose/duration other than summary sentence which indicates the various conditions reported in the literature generally have occurred after a "period of months to years." |

■■■■■■■■■■■■

■■■■■

abilities, and disturbances of mood The onset of such behavioral complaints occurs during periods of excessive exposure to solvents and persists after exposure has ceased. A nonspecific manifestation of early solvent toxicity has been referred to as "neurasthenic syndrome," which manifests primarily as fatigability, irritability, depression, and episodes of anxiety. Although obviously caused by many other etiologies, this constellation of symptoms occurs frequently in individuals with excessive exposure to solvents in the absence of more pronounced disruptions of neurobehavioral function. Follow-up studies of patients with solvent-induced toxic encephalopathy have shown persistence of functional impairment years after removal from solvent exposure." (Emphasis added.)

| Edward L. Baker & Lawrence J. Fine, *Editorial, Solvent Neurotoxicity The Current Evidence*, 28 J. Occupat'l Med. 126 (1986) | Review article | N/A | Organic solvents generally | N/A | Reviews evidence related to the WHO syndrome categories. | A characteristic distal, *symmetrical* sensimotor peripheral has been clearly demonstrated following exposure of humans and animals to several specific *solvents: n-hexane, methyl-n-butyl-ketone (MBK) and carbon disulfide*" | No. Author states that no dose-response relationship or pathogenetic explanation has been established. PN has been shown only with respect to particular solvents-*n*-hexane, methyl *n*-butyl ketone, and carbon disulfide, and it is symmetrical in nature. Only scientifically convincing evidence of chronic toxic encephalopathy (CNS) comes from studies on the deliberate abuse of toluene |
| | | | | | (1) Acute intoxication *with no lasting effects* is well-established. | "Less convincing evidence exists linking mixed solvent exposure to clinically significant peripheral nerve disorders... [I]ncreased risk of PNS disorders appears in certain populations [exposed to solvent mixtures, such as painters and lacquerers] *However, the relationship of those disorders to specific agents has not been elucidated.* Furthermore, clear distinctions between clinical and sub- | |

clinical neuropathy have not been made in all studies, rendering the interpretation *difficult.* In studies of currently exposed groups, the rates of PNS toxicity have been less than CNS effects."

(2) Acute toxic encephalopathy "is well recognized as an effect of excessive exposure to lead, mercury and other toxic agents. *The condition has not been described as a characteristic finding in excessive short-term solvent exposure.*"

"The underlying pathogenesis of toxic encephalopathy is unclear and requires further study. *The lack of consistent dose-response relationships in chronic epidemiologic studies* makes it difficult to determine whether current exposure to levels below accepted PELs is truly hazardous. In fact, a recent U.S study failed to observe consistent neurobehavioral deficits and current exposure documented at levels below relevant PELs."

(3) Organic affective syndrome (duration· days or weeks; no sequelae) ("a reversible mood disorder") occurs in individuals with chronic solvent exposure (dose/duration unspecified).

"As yet unresolved are the difficult issues of dose-response relationships and pathogenetic mechanisms [for CNS and PNS effects.]"

(4) *Chronic toxic encephalopathy* (mild or severe) (mood changes, short term memory and psychomotor impairment) "has been reported," *"The most convincing scientific evidence* derives from studies who have *abused* solvent-containing products [e g, model glue]." Other studies involving exposed populations have shown varied results whose interpretation is difficult. *"Further case-referent studies are needed to clarify the results of those two investigations."*

| Anna Maria Seppalainen. *Neurophysiological Effects of Long–Term Exposure to a Mixture of Organic Solvents,* 4 Scand. J. Work Environ. & Health 304 (1978) | Cros-sectional study with control group of age-matched railroad engineers. | 102 car painters randomly selected from 27 garages in Helsinki | Mixture of solvents in paint, principally toluene, xylene, butyl acetate and white spirit. | Exposure ranged from 1 to 40 years (mean 14.8 years, SD 8.5 years). Concentration in the workplaces average 31.8% of the Finnish TLV, with concentration of specific solvents ranging from 4 to 212% of the TLV. | Abnormal EEGs in 32 car painters and 37 referents. 26 car painters had complex of CNS symptoms; 12 referents had same complex 46% of car painters with syndrome had abnormal EEG, while only 26% of the | "The fact that slight peripheral nervous lesions could be shown in a group of car painters in comparison to railroad engineers indicates that even at a relatively low level of exposure a mixture of organic solvents *may affect* | No. Tends to support conclusion that organic solvent exposure may cause PN, but mean exposure was 14.8 years, and subjects were tested as few as 16 hours since last exposure. Thus, does not support |

| Subjects / Tests | Symptoms Described or Tested | Authors' Comments and Conclusions | Supports Conclusion that Subacute Exposure can Cause Chronic Effects? |
|---|---|---|---|
| EEGs taken of all subjects; EMGs taken of 59 painters and 53 referents with similar age distribution. | car painters without the syndrome did. Referents did not show this tendency. Abnormally slow motor and sensory nerve conduction velocities were found in 12/59 car painters but 2/3 referents. Findings showed "slight" positive signs of slowed nerve conduction velocities and no increase in EEG abnormalities in comparison with referents. | the nervous system in an undesirable manner." | conclusion that short-term exposure (3–30 days) can cause permanent PNS effects Nor does study support the claimed chronic CNS effects, since, based on the EEG results, authors found no evidence of significant difference in CNS function. |
| Tests administered at least 16 hours after last exposure. | NCV studies showed abnormalities in the maximal motor and sensory velocities and motor distal velocities in 20% of car painters tested, but none of referents. But the *"abnormalities were slight if concluded from the fact that the mean conduction velocities of the car painters did not differ statistically significantly from the engineers"* | The "mainly low to moderate" exposure of the car painters did not "separate the car painters from the reference population with respect to EEG results." "No definite EEG features separated the car painters from the railroad engineers." | |

Table 2. Literature Cited by Dr. Rutchik.

| Article | Type | Subjects | Substance | Duration and/or Dose | Symptoms Described or Tested | Authors' Comments and Conclusions | Supports Conclusion that Subacute Exposure can Cause Chronic Effects? |
|---|---|---|---|---|---|---|---|
| Douglas N Klaucke et al., *An Outbreak of Xylene Intoxication in a Hospital,* 3 Am. J. Ind. Med. 173 (1982) | Uncontrolled case report | 15 affected employees at community hospital after fumes from 1 litre of discarded xylene entered the ventilation system. | Xylene | Estimated exposure was up to 700 ppm. | Headache, nausea, vomiting, and dizziness, eye, nose or throat irritation.<br><br>Mediation duration averaged 36 hours, ranging from 2 to 48 hours. | N/A | No. No permanent injury noted. Acute intoxication from acute exposure. All subjects' symptoms resolved within 48 hours. |
| R. Morley et al., *Xylene Poisoning: A Report on One Fatal Case and Two Cases of Recovery After Prolonged Unconsciousness,* 3 Brit. Med. J. 442 (1970). | Uncontrolled case report | 3 male painters, aged 54, 42, and 24, lost consciousness and remained undiscovered for 18.5 hours in a closed compartment inside a ship which contained xylene vapor. Compartment was approximately 17' (L) × 17' (W) × 4.67' (H) feet with virtually no ventilation. | Xylene | Exposure for 15 hours to 10,000 ppm xylene with virtually no ventilation and no respirators. | One man died, with evidence of lung, liver, and brain damage. The other two recovered, showing only transient liver damage, and in one case, temporary impairment of renal function. | Authors suggest xylene might be useful as an anesthetic. | No. Ultra-high dose exposure caused one death. No lasting effect reported in the other two men. |
| Roberta N. Hipolito, *Xylene Poisoning in Labo-* | Uncontrolled case report | 5 laboratory technicians who worked with xy- | Xylene | Exposure between 1.5 and 18 years | 58 year-old woman with 15 years exposure in 6x8 | N/A | No. Anecdotal reports by a laboratory technician, |

| | | | | |
|---|---|---|---|---|
| ratory Workers: *Case Reports and Discussion*, 11 Lab. Med. 593 (1980) | lene in unventilated rooms. | | foot unventilated room. After 11 years, she began to complain of headaches, LG fever, dyspnea, flushes, nausea and vertigo. After 15 years she collapsed with severe chest pain and abnormal ECG. Has not worked since. Disabled, low in energy, and capable of only limited self care.<br><br>66 year-old woman with 6 months of constant xylene exposure reported cyanotic hands, fever, heart racing, general malaise. After she was removed from xylene, "she felt fairly well although not completely recovered."<br><br>35 year old woman with 4 years of exposure began to experience chronic headache, mental "fuzziness," chest pains and extreme fatigue. No discussion of any residual effect.<br><br>A fourth woman complained of headache, fatigue and low WBC count. After cessation of exposure, she reported being in "good health."<br><br>A fifth woman complained of chest pains after 6 months of exposure in unventilated room. After moving her work station away from xylene source, "her general health is *greatly improved.*" | not a scientist or doctor. Only one report mentioned permanent damage: a worker with 15 years of exposure whose symptoms began 4 years earlier. |
| Kaj Husman & Pauli Karli, *Clinical Neurological Findings among Car Painters Exposed to a Mixture of Organic Solvents*, 6 Scand. J. Work Environ. Health 33 (1980) | Cross sectional study with nonexposed reference group. | 102 male car painters and 102 age and sex matched locomotive engineers and assistants. | Various organic solvents | Exposure ranged from 1 to 40 years (mean 14.8, SD 8.5). | Statistically significant difference in frequency of psychoorganic syndrome (changes in judgment, comprehension, memory, attention, response time), decrease in sense of touch and pain, increase in vibratory threshold. $^{69}/_{102}$ painters had decreased sense of vibration in lower extremities, compared with $^{24}/_{102}$ referents. | Dizziness, unusual tiredness, concentration difficulties, and impaired memory are the most commonly reported symptoms of workers who are chronically exposed. | No. Although the authors found significantly worse sensory findings and subjective neuropsychological signs, the resulting abnormalities were subclinical in nature, and appeared in painters who had a mean exposure of 14.8 years. |
| | Blind neurological exam. Range of motion, reflexes, sense of light touch and pain, vibratory thresh- | These are the same subjects as in Seppalainen (1978), summarized in Table 1, *supra.* | | | In $^{72}/_{102}$ pairs, the painter had greater signs of organic syndrome, and in $^{39}/_{101}$ pairs the exposed subject | On objective testing, "[o]nly few pathological findings appeared, and no statistically significant differ- |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| olds, and muscle strength tested. | | | | had more pathological sensory findings. | | | ences, between the groups with respect to cerebellar and extra pyramidal system, the cranial nerves, and peripheral motor and sensorimotor functions." |
| | | | | 16 painters had a worse sense of pain in the hand than their referents. Sense of vibration was more affected in peripheral areas of both the upper and lower extremities than among the referents, especially in lower extremities. | | | "[N]o signs were found that indicated lesions in the peripheral motor system." |
| | | | | | | | "Pathological findings .. for the sense of light touch occurred more frequently in the exposed group only in regard to *both* hands, and *not in the lower extremities or the trunk.*" |
| | | | | | | | Changes in vibratory threshold seems to be the most sensitive function to suffer in long-term exposure.Although these were "clear signs of CNS and PNS lesions," they were not clinical in nature: "they were not ill in the clinical sense." |
| | | | | | | | Although these were "clear signs of CNS and PNS lesions," they were not clinical in nature: "they were not ill in the clinical sense." |
| Anna Maria Seppalainen, *Neurophysiological Effects of Long–Term Exposure to a Mixture of Organic Solvents*, 4 Scand. J. Work Environ. & Health 304 (1978) | *See* Table 1. *supra.* | | | | | | |
| Margit L Bleecker et al., *Dose–Related Subclinical Neuro-behavioral Effects of Chronic Exposure to Low Levels of Organic Solvents*, 19 Am. J. Ind Med. 715 (1991) | Cross-sectional study designed to determine the occurrence of painter's syndrome (i.e., deficits in memory, concentration, fatigue, personality changes, headache, irritability). | 187 workers in two paint factories | Toluene, xylene, methyl ethyl ketone, and other aliphatic and aromatic hydrocarbons. | Total average exposure for the various solvents considered ranged from 0.4 ppm to 31.2 ppm. | See next column. | "Linear regression analysis controlling for several confounding variables demonstrated significant correlations between increasing exposure to mixed organic solvents and neurobehavioral performance for vibration threshold and several neuropsychological tests. Dose-related effects of chronic solvent exposure on neurobehavioral outcomes (*all subclinical*) were shown, *but "typical" symptoms* | No. Authors reject an association between sub-TLV, chronic exposure and organic affective disorder. Dose-effect relationship between certain neurobehavioral test results was seen only in workers with more than 10 years of exposure, but the effects were all subclinical. No signs of peripheral neuropathy were observed in any of the subjects. |

Administered medical psychological questionnaires, neuropsychological batteries, vibration threshold testing.

Testing occurred at the beginning of a work shift.

Regression analysis included confounding factors of age vocabulary score, alcohol, smoking, race, work shift, and plant location.

Employment ranged from 3.5 months to 36 years with a mean of 15 years.

Only the 176 workers who had at least 5 years of employment were subjected to the neuropsychiatric and neuropsychological tests.

characteristic of painter's syndrome were not found."

"When an association between a toxic exposure and a health outcome is observed, the presence of a dose-response or dose-effect relationship is of critical importance in establishing whether the association is causal."

Criticizes other studies that have found associations for not controlling for confounding variables, such as intelligence.

"Painter's syndrome due to chronic low-dose solvent exposure is reported usually to develop following *at least 9 years of exposures, with incipient cases identified after 3 years of exposure*"
"[S]olvent-induced central nervous system dysfunction is thought to require *5–10 years of exposure*"

Study found statistically significant dose-response relationship only on certain neurobehavioral tests: digit symbol substitution, serial digit learning, reaction time, "Trails A", "Trails B", and "Toe"

"[N]o correlation was found between these outcome measures and responses on the symptom questionnaires or neuropsychiatric evaluation. *Thus, these were subclinical findings*"

Subjects were divided into those with more than 10 years of work and those with 10 or fewer years of work. Significant effects in these 6 areas were found only in the workers with more than *10 years of exposure.*

Disputes previous painter's syndrome studies· "*'[T]ypical' subjective symptoms of central and/or peripheral nervous system damage were absent in the present population.*"

Authors rejected "healthy worker effect" as an explanation for the absence of findings

based on personnel records that showed less than 5% per year turnover.

*'No study subject had symptomatology compatible with a peripheral neuropathy "*

"[Vibration threshold] changes, which were small and not associated with symptoms, may never develop into a clinical neuropathy."

*"Analyses showed that the dose-effect in these neuropsychological tests was not the result of acute solvent exposure but required chronic exposure to low levels for more than 10 years."*

"The association of a psycho-organic syndrome with exposure to chronic levels of solvent was not supported in this study. Dose-related *subclinical* neurobehavioral effects in the central and peripheral nervous system were demonstrated."

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Stig–Arne Elofsson et al , *Exposure to Organic Solvents*, 6 Scand. J. Work Environ. Health 239 (1980) | Cross-sectional study with control group. | Subjects: 80 car or industrial painters (in 20 different shops). | Toluene was most common solvent, but xylene, TCE, and white spirit were also common. | Sub-TLV exposure. | Statistically significant differences were found indicative of neurasthenia, reaction time, manual dexterity, perceptual speed, short-term memory. No significant differences in verbal, spatial or reasoning tests. Significant differences found in the majority of neurophysiological parameters measuring peripheral nerve functions | "It appears from the results that the solvent-exposed workers had a higher frequency of neurological and psychiatric symptoms than their referents" | No To the extent significant neurologic effects were found, they were subclinical in magnitude; as authors note, the exposed group consisted of "people in full daily work" Moreover, no dose-response relationship could be found. The study did not specify the duration of exposure, and since it involved currently exposed workers cannot warrant a conclusion as to whether the observed effects would persist after cessation of exposure |
| | Psychiatric interviews, psychometric tests, neurological, neurophysiological and opthalmological tests and CT scans. | Controls: two matched referent groups of 80 non-exposed, age- and education-matched electronics plant workers. | | Use of preventive equipment and work conditions were factored into an exposure index. Only those 80 painters with the highest indices out of 156 initial subjects were examined. | "In comparison with both reference groups, the exposed group had a clearly higher symptom score for 11 items (inner tension, irritability, fatigability, aches and pains, learning problems, short- and long-term memory problems, nausea, epigastric pain, headache, and . precision movement). Statistically significant differences were found for five ad- | However, the neurological results, even where significant, were subclinical. "[W]e found statistically significant difference between the exposed group and, in particular, reference group 2 that indicated a reduced function of peripheral nerves . . *However, the differences were small, and all the mean values were within normal limits "* | |

| | | ditional items (worrying over trifles, concentration difficulties, vertigo and dizziness, dyspnea, and mood lability). The most pronounced differences were observed for memory problems, headache, and fatigability." | |
|---|---|---|---|
| Subjects were examined over two consecutive days during the work week. | Range or mean duration of exposure not given. | "The psychiatric investigation showed that psychiatric complaints were considerably more common among painters than among [referents]." | *The painters "were fully fit for work, and there was no reason to expect any grave clinical abnormalities among them."* |
| Unexposed only *for 18 to 24 hours* before testing. "We therefore do not know to what extent the observed effects were or were not reversible." | | Psychological exam showed statistically significant differences in memory, perceptual speed, manual dexterity, and simple reaction time. *But "it was not possible to demonstrate any effect or correlation that indicated a dose-response relationship."* Authors hypothesize the healthy worker effect as an explanation of these "somewhat contradictory" results | *"We have not been able to demonstrate a correlation between degree of exposure and extent of effect (dose-response correlation)"* |

Neurologic: Significant differences were found for Romberg's test, finger to nose test, finger to finger test and finger tremor. *But in "all cases the findings were minor," and "must be regarded with caution" because the examinations were performed by "two physicians, for whom the distribution of exposed and reference subjects was unequal."*

No significant differences in EEGs found, and authors note that other studies that *did find significant* differences in EEGs, did not find a dose-response relationship.

Significant difference found in the function of the purely sensory sural nerve distally on the lower leg, but nothing in arms.

Significantly higher vibration thresholds found, but an "increased vibration threshold is not neces-

sarily associated with sensory symptoms."

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Raymond Y. Demers et al., *Peripheral Vibratory Sense Deficits in Solvent-Exposed Painters*, 33 J. Occupational Med. 1051 (1991) | Cross-sectional study with reference group. Tested vibration thresholds. | 28 commercial painters and reference group of 20 unexposed boiler makers. | Solvents in order of frequency were mineral spirits, toluene, ketones, and xylene. | Painters had an average of 30 years of painting exposure. | Significant differences in vibratory threshold were seen in the non-dominant great toe, the nondominant index toe, the nondominant index finger, the fingers in combination, and the summary vibration scores for all four digits. | Because of the small sample size, "[l]arger numbers are needed to establish a dose-response relationship between specific solvent exposures in painters and resulting vibration sense abnormalities. Causality must also be linked with specific solvents." | No. Involves workers with 30 years of exposure, makes findings only with respect to vibration threshold, and declines to posit a dose-response or causal relationship in light of the small sample size. |
| Frank J. Bove et al., *Sensory Thresholds among Construction Trade Painters: A Cross-Sectional Study Using New Methods for Measuring Temperature and Vibration Sensitivity*, 31 J. Occupational Med. 320 (1989) | Cross-sectional study with reference group. | 93 construction painters and a reference group of 105 healthy construction and industrial workers. Painters who had retired more than two years earlier were excluded since "recovery of peripheral nerve function can occur within a few years after cessation of exposure." | Not specified. | Mean years worked = 18 years. 20 weeks worked in last years, mean. 9 days worked in last month, mean. | See next column. | Explains peripheral neuropathy as follows: "*The onset and early stages of the disease are insidious.* Initial symptoms such as numbness and tingling occur frequently in the lower extremities. As axonal degeneration proceeds, *symmetrical* sensory and motor loss develops in a 'stocking-glove' fashion." "The disease can continue to progress for several months after cessation of exposure, *but thereafter improvement occurs, with all but the most severely affected regaining all or most of motor and sensory function* In severe cases, neuropathy persists for several years after exposure cessation." Identifies as suspected peripheral neuropathic toxins carbon disulfide, methyl *n*-butyl ketone, and arsenic, but not xylene Notes that existing studies with painters and vibratory thresholds have found only subclinical differences. Results: no statistically significant difference in temperature sensitivity thresholds, but significant correlation found between vibratory sensitivity and lifetime exposure and exposure over past month variables. Abnormal results on the neurologic examination tended to be among relatively older painters who had | No. Found only subclinical deficits in vibratory sensation in group of currently exposed painters with a mean exposure of 18 years |

worked many years but had worked relatively less than other painters in the previous year.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| M.W.M.M Ruijton et al., *Neurobehavioral Effects of Long–Term Exposure to Xylene and Mixed Organic Solvents in Shipyard Spray Painters*, 15 Neuro Toxicology 613 (1994) | Cross-sectional study with age-matched referents. | 31 painters (11 of whom had already complained of illness) and 38 referents | Spray painting with >50% xylene. | Mean exposure 16 9 years (SD 9.5). | Symptom questionnaire showed significant differences in mood change, equilibrium, fatigue, "solvent related complaints." | Results indicate that complaints regarding mood changes, equilibrium and fatigue were more severe in painters than in referents but were not related to the estimated life-time exposure index. | No. Found primarily symptomatic complaints in currently exposed painters with a mean exposure of 16 9 years. |
| | Symptom questionnaire designed to test for organic affective disorder, nerve conduction velocity tests, and computerized performance tests | | Respiratory and skin protection was used when spray painting in confined spaces. | | Neurological: significant velocity difference in nerves of the leg. | "Limited information on the effects of exposure to xylene ... is available, which consists mainly of symptomatology, including fatigue, headache, irritability, apathy, dizziness, loss of appetite, dry throat, alcohol intolerance and sleep impairment. In the present study complaints regarding fatigue, dizziness and mood changes ... were prominent .. Surprisingly, memory complaints and absentmindedness are not mentioned as part of the occurring symptoms, nor were they found in the current study." | |
| | | | | | Neurobehavioral: significant differences only in two attention span tests | Cites another study on xylene involving *symmetrical* PN. | |
| Anna Maria Seppalainen et al , *Neurophysiological and Psychological Picture of Solvent Poisoning*, 1 Am. J. Ind. Med. 31 (1980) | Uncontrolled case-series report. | 107 patients already diagnosed with solvent poisoning after long-standing exposure. | 55 of the subjects had been exposed to non-paint related solvents, principally TCE [degreasing] and perchloro-ethylene [dry cleaning] | Mean exposure of 9.6 years for male patients; mean of 7.6 years for female patients | 70/107 had abnormal EEGs, though the abnormalities were slight in degree, all in subjects with "intermediate" or "high" exposures | "Nervous system involvement was usually of mild degree, eg, no cases of actual paresis were detected." | No. Descriptive study of already diagnosed patients, showing slightly abnormal EEGs and slowed NCVs and deficits in certain attention span tests in men with a mean of 9.6 years of exposure, half of them to chemicals other than paint solvents No dose-response relationship was found on the NCV studies. |
| | EEGs and psychological battery on all subjects and NCS on 77 subjects. | | Exposure usually near the Finnish TLV. | | 17/31 men and 3/16 women had at least one abnormally slow CV CV scores were not found to be correlated with length of exposure or age. | No relationship between the neurophysiological and neuropsychological results emerged· "Psychological performance scores in patients with abnormal EEGs, were not found to be significantly different from those of patients with normal EEGs " | |
| | | | | | On neuropsychological battery, | Authors concluded that increased | |

the mean scores on digit span and digit symbol were significantly lower than the Finnish average for men, and similarities, digit symbol, picture completion and block design were significantly lower than Finnish average for women.

"Although the correlations between the exposure level and/or length of exposure and neurophysiological or psychological findings were relatively weak, we think that our findings are related to the occupational solvent exposure .. It is possible that the exposure level is a more potent determinant of the effect than the mere length of exposure and that repeated episodes of high-peak exposures may play a major role in causing the nervous system effects."

frequency of abnormal EEGs indicates toxic encephalopathy.

| Anna Maria Seppalainen & Mari Antti-Poika, *Time Course of Electrophysiological Findings for Patients with Solvent Poisoning: A Descriptive Study*, 9 Scand. J. Work Environ Health 15 (1983) | Uncontrolled follow-up study. | 87 patients (40 men and 47 women) previously diagnosed with chronic solvent intoxication after occupational exposure. | 21 exposed to perchloro-ethylene (perc) or TCE; 53 exposed to solvent mixtures; 13 to both solvent mixtures and TCE or perc. | Mean exposure was 10.7 years (range 1–33). | EEG comparisons. 26 clearly improved, 15 slightly improved, 28 similar (19 of which were normal both initially and at follow-up), 14 slightly deteriorated, 4 moderately deteriorated. On initial exam and follow-up EEG abnormalities were "slight in degree." "Severe abnormalities were rare." | Mentions "paresthesia, muscular pain, and diminished strength" as possible effects of exposure. Cites 2,5 hexanedione; 2,5 hexanediol; n-hexane; and methyl n-butyl ketone as suspect agents. | No. Authors of this descriptive follow-up study with no control group expressly state that the results are only "suggestive." Subjects were exposed for a mean of 10.7 years. Only 61% of the subjects were exposed to xylene, and those that were, were also exposed to host of other chemicals. Authors disclaimed ability to relate the conditions observed to specific chemicals. CNS and PNS effects were noted to be "slight" in degree, often with improvement "to a normal or almost normal state" over time. And no dose-response relationship was found. |
|---|---|---|---|---|---|---|---|
| | EEGs and EMGs performed 3 to 9 years (mean 5.9 years) after initial diagnosis. | Mean age of subjects was 38.6 years at initial diagnosis (range 20–59). Original subjects numbered 106: only 87 came for reexamination. On initial exam, only 73/106 had EMGs. "In most cases the patients had also been exposed to thinners, the main component of which was toluene and which usually also contained methyl isobutyl ketone, isobutanol, and ethylene glycol, or *sometimes* pe- | Solvent mixtures were mainly aliphatic hydrocarbons (petroleum benzine), ethyl toluenes, and trimethylbenzenes. | 54 patients stopped working after the initial diagnosis, 33 continued to work in exposed conditions for different lengths of time, 5 were still working at the time of the follow-up. | EMG comparisons 7 clearly improved, 24 slightly improved, 18 similar, 22 slightly deteriorated, 2 moderately deteriorated. "Polyneuropathy of *slight* degree was the most usual finding." | No dose-response found: "The duration and level of exposure or the immediate termination of exposure after the diagnosis had no clear relationship to the prevalence, the type, or the time course of the EEG or EMG findings." | |

troleum benzine, isopropanol acetone, xylene, and butyl acetate."

No control group.

Some tendencies were noted· patients with exposure to both solvents and to perc or TCE had more neuropathic findings than those exposed to either alone.

"The present study is descriptive, and only cautious conclusions can be drawn from its results. The main problems in· the evaluation of *the results concern* the uncertainty of the initial diagnosis of the patients and the lack of a control group during the follow-up." Results, either where statistically significant, should only be considered "suggestive."

Although some have reported an initial deterioration during the *first 1 to 4 months* after exposure, "[r]ecovery to a normal or an almost normal state has been common among patients with occupationally *induced neuropathy.*"

"On the basis of this study it is impossible to define selective differences between the effects of different solvents."

"The present knowledge on the metabolic and pharmaco-kinetic mechanisms of various solvents singularly and in combination is so limited that these differences are not readily explained."

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mari Antti–Poika, *Overall Prognosis of Patients with Diagnosed Chronic Organic Solvent Intoxication*, 51 Int'l Archives of Occupational & Environ Health 127 (1982) | Report on the same reexamination of the same 87 patients in discussed in Seppalainen & Antti–Poika (1983), *supra.* | *See* Seppalainen & Antti-Poika (1983), *supra.* | *See id.* | This article states that at the initial exam, 1/7 patients had not been exposed for 1–6 months before diagnosis, 3 for 7–9 months, and 2 for 5–6 years. | At time of initial diagnosis, 31 patients had objective clinical neurologic signs, whereas remaining 56 had only subjective symptoms and neurophysiological or psychological findings attributed to solvent intoxication. Upon reexamination, the condition [taking neurologic and psychological signs together] of 23 had improved; 43 remained unchanged; and 21 had deteriorated. | "The intoxication was slight in most cases. . *The number of patients with clinical polyneuropathy in the present study was so small that the trend cannot be definitely evaluated*" | No. Same comments as for Seppalainen & Antti-Poika (1983), *supra.* In addition, authors noted no statistically significant association between level or duration of exposure and prognosis. Further, authors found no significant number of patients with PN of clinical severity. |
| | This article discusses the results *of an interview* | | | | Upon diagnosis and reexamination, the most | The prognoses yielded by the neurologic and | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| and psychological exam, in addition to the EEGs and EMGs discussed in the 1983 article. | | | | | common symptoms were fatigue, headaches, and memory disturbances. The symptoms related to PNS were pain, numbness, and paresthesias in the extremities. Common CNS disturbances were psycho-organic syndrome, cerebellar disturbances, disturbances in gait and station; in PNS, sensory disturbances and diminished tendon reflexes. NCVS showed slow velocities; psychological tests showed broad range of disturbances. | psychological examinations correlated poorly with one another. *No statistically significant correlation was found between the overall prognosis and age, sex, the duration and level of exposure, the termination of exposure after diagnosis*<br><br>"Considering the limitations described above, only cautious conclusions can be drawn. However, some trends can be seen. Even some of the mildest cases of chronic solvent intoxication may stay unchanged or even deteriorate." | |
| Douglas H. Linz et al. (1986) | *See* Table 1, *supra.* | | | | | | |
| Pall Orbaek et al., *Effects of Long-Term Exposure to Solvents in the Paint Industry,* 11 Scand. J. Work & Environ Health (Supp.2, 1985) | Cross-sectional study with age- and education-matched referents. | 50 male paint factory workers exposed for 5–46 years (mean 18 years). All subjects were active workers at the time of exam. | Eight most common solvents in factory included xylene (80 ppm). Toluene was also among the eight. | Exposed group selected for minimum of 10 years' employment in solvent-handling occupations. | Blood tests: Significantly lower blood cell counts, but no dose-response relationship found. No statistically significant differences between subgroups, nor dose-response relationship found, with respect to serum enzyme tests. | CNS: Subjective symptoms of brain dysfunction were significantly more frequent among the exposed subjects and an exposure-effect was found. Cerebellar blood flow was reduced by 4%. Neuropsychological tests showed indication of brain dysfunction in 14% of the exposed subjects in comparison to none in the reference group (increased power in the delta and beta bands). The exposed subjects performed significantly worse on attention tests. | No. Supports association between combination of organic solvents and neurasthenia/organic syndrome effects—diffuse subjective symptoms without objective deficits—in currently exposed workers with a mean of 18 years exposure. Only objective neurobehavioral finding was decreased attention in high-exposure subgroup. Also found changes in EEGs and lower cerebellar blood flow (but not pathologically lower). |
| | Questionnaire, regional cerebellar blood flow tested, EEGs, PNS tests (NCVS, nerve potential amplitude, vibration and temperature thresholds), blood tests, physical and neurological exam. | | | Exposure index based on sum (HE) of the quotients of concentration/ TLV was used. Mean exposure was 16 HE × years; median was 10HE × years. | Neurological: *A neurophysiological exam of the PNS showed no difference between the groups. Clinical chemistry demonstrated no differences that could be explained by solvent exposure.* | "The psychological investigation disclosed *very few statistically significant different between the exposed and reference groups ....* The main finding in our study was the significant differences in ... sustained focused attention ....* Effect of exposure seems to be on attentive capability, rather than complex, symbolic or intellectual operations. Deficit was present only | No signs of clinical PN were found; in fact, with the except of the response of the sural nerve, the exposed workers had *better* test results than the reference group. |

Life-style, medical, mental, and sociological confounding factors were included in the analysis.

Exams were performed on Monday.

Two subjects in *each* group had clinical signs of slight neuropathy Significantly more exposed workers reported mental exhaustion during the work day, but physical exhaustion was rare in both groups. Exposed subjects complained of more CNS and PNS symptoms (significant differences: (CNS) fatigue, memory failure, irritability; (PNS) tingling, paresthesia, numbness, (psychosomatic) headache, sweating, chest oppression)), with trend towards more complaints in high exposure subgroup Supports finding of neurasthenia.

EEGs. differences in power within frequency bands, and different relative distribution of EEG in the anteroposterior direction. Tentatively suggest that changes reflect a neurotoxic effect.

Regional cerebellar blood flow was 4% lower (p < .05), but the result is not pathological.

Psychiatric interview: symptom score for exposed group was significantly higher for every reported symptom (inner tension, mood lability, worrying, hostility, reduced sexual interest, bowel problems, epigastric pain, increased sleep, headache, fatigability, concentration, learning

in the high exposure subgroup. "A prolonged exposure , seems to cause a deficit in sustained focused attention. The exposed subjects were full-time workers and were nonpatients in the sense that they had not sought medical care for suspected disease or solvent poisoning."

PNS. "The neurographic and psychophysiological variables tended to be slightly *better* among the exposed workers than among referents. The only exception was the sensory response of the sural nerve.... There was no significant difference between the subgroups with low and high exposure indices." Authors conclude: "*Although the preliminary survey indicated a slightly increased prevalence of cases with neurographic signs of polyneuropathy, this increase was not confirmed in the quantitative evaluation of the measurements*

"However, the significantly, increased temporal dispersion of the sensory action potential of the sural nerve is noteworthy and may indicate a sign of mild affection of the most peripheral sensory neurons examined in this study."

"In general we did not find impairment in the peripheral nerves. The exposed group had slightly *better* nerve function parameters, except for the longest sensory nerve fiber of the body in the sural nerve ...."

Notes that literature describes the onset of PN as insidious.

None of the workers had conditions that had prompted them to seek medical attention or which would affect daily life activities, i.e., the effects, if any, were subclinical in magnitude.

problems, short-term memory problems.) Supports the presence of neurasthenia/organic affective syndrome. (Though in the majority of cases, low scores were reported for both groups.)

Psychological: battery of cognitive tasks. "Of the 14 variables analyzed only one measure showed statistical significance"—the Dots test [a cancellation test of the Bourdon–Wiersma type; measures perceptual speed and accuracy]. Dots was also the only test that showed any significant difference between low, medium, and high exposure subgroups [potential dose-response relationship] Clinical evaluation of individual psychometric profiles: $22/30$ of exposed subjects showed no sign of cognitive dysfunction; $1/30$ slight deviation from norm; $7/30$ pathologically affected. In reference group, $31/50$ were normal; $19/50$ had slight deviations in one function, but none had deviations in two or more functions.

None of the subjects "had signs of any major disease that could affect the nervous system or daily life activity."

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Eugene D. Means et al., *Pathology of Lacquer Thinner Induced Neuropathy* 5 Annals Clin. & Lab. Med. 240 (1976) | Uncontrolled case-series report. | 7 men aged 17 to 22 who repeatedly inhaled same brand of lacquer thinner (habitual "huffers"). | The lacquer thinner contained 11 ingredients, including xylene (43.6% by volume), toluene (3.9%), and $n$-hexane (0.5%). | Unspecified | Physical exam established a picture of predominantly motor neuropathy with severe neurogenic muscular atrophy. Effect was rapidly progressive, *symmetrical* motor and sensory neuropathy. Motor nerve conduction velocities were markedly slowed Fascicular biopsy specimens of sural nerve showed a striking loss of myelinated nerve fibers. Autopsy material in one case revealed central chromatolysis of anterior horn cells in the lumbosacral enlargement and axonal swellings in the fasciculus gracilis | "It is our conclusion that one or more of the constituents of the lacquer thinner was responsible for the peripheral neuropathy. *The responsible chemicals have not yet been identified. None of the constituents … except for minute quantities of n-hexane, to our knowledge have been reported to exert toxic effects on the peripheral nervous system, although central effects have been described.* Similarities in structure between 2–heptanone (methyl amyl ketone) and methyl n-butyl ketone, a known cause of peripheral neuropathy, suggest that 2–heptanone alone or in combination might be the responsible chemical." Notes association of PN with $n$-hex- | No This was a case of repeated, intentional, direct inhalation Even so, the resulting PN was symmetrical, and the authors declined to conclude which of constituent chemical or combination of chemicals caused the neuropathy. To the extent, they hazard a guess, the authors suggest 2–heptanone was the culprit, not xylene, despite the fact that the thinner was 43 6% xylene by volume. |

212

ane and methyl $n$-butyl ketone.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Kaj Husman, *Symptoms of Car Painters with Long–Term Exposure to a Mixture of Organic Solvents*, 6 Scand J. Work & Environ Health 19 (1980) | Cross-sectional study with age-matched reference. | Subjects 102 active male car painters from 27 Helsinki garages [the same group as in Seppalainen (1978) and Husman (1980), *supra*]. | Exposure to variety of solvents, including toluene, xylene (5 8 ppm), butyl acetate, white spirit, etc. | Exposure at ½ TLV Exposure ranged from 1–40 years (14 8 mean, SD 8.5). | See next column. | Symptoms of fatigue and disturbances in memory and vigilance occurred significantly more frequently among exposed group. When symptoms during the workshift were compared, irritation and prenarcotic symptoms (itching, nausea, drunken feeling, dizziness, shortnes of breath, absentmindedness, misunderstanding orders) were reported significantly more frequently. *No difference in symptoms of PN (numbness or tangling in the legs).* | No. Describes acute intoxicating effects in currently exposed painters with a mean of 14.8 years of exposure. No evidence of PN found. |
| | Symptom questionnaire. | Reference group consisting of railroad engineers and assistants. Referents had somewhat higher education. | | | | No statistically significant trend found between high and low exposure subjects on general subjective (chronic) symptoms. | |
| Stephanie S. Padilla & Donald P. Lyerly, *Effects of p-Xylene Inhalation on Axonal Transport in the Rat Retinal Ganglion Cells*, 101 Toxicology & App. Pharmacology 390 (1989) | Experimental animal study. | Rats | Xylene | Exposed to varying concentrations of p-xylene, ranging from 50 ppm for a single 6–hour exposure to 1600 ppm, 6hr/day 5days/week, 1.5 weeks. | See next column | Only relatively severe concentrations (800 or 1600ppm for 1 5 weeks) produced significant reduction in axonal transport. Decrease in axonal transport after 13 days after cessation of exposure seen, but only in the 1600 ppm rats Authors suggest this may indicate that p-xylene can have permanent effects; "once deficits are manifest, they can persist even after exposure has ceased." Notes that "there is sparse information regarding the toxicity of xylene in humans or in experimental animals." | No. Animal study involving >500 ppm exposure. Only found that at 1600ppm effects on axonal transport could last 13 days Extrapolation from 13–day effect in rats to permanent effect in humans would be speculative. |
| Herbert H. Schaumburg & Peter S. Spencer, *The Neurology and Neuropathology of the Occupational Neuropathies*, 18 J. Occupational Med 739 (1976) | Review article on the anatomy and pathology of the peripheral nerve | N/A | $n$-hexane, acrylamide, methyl $n$-butyl ketone, and 2,5–hexanedione | N/A | N/A | Describes the axonal "dying back" theory of pathogenesis Cites n-hexane, acrylamide, methyl $n$-butyl ketone, and 2,5–hexanedione as known causes' "this discussion is centered primarily on these compounds." Does not discuss xylene. | No. Discussion of pathogenic effects are expressly limited to 3 solvents other than xylene. |

Table 3 Literature Cited by Caravanos.

| Article | Type | Subjects | Substance | Duration and/or Dose | Symptoms Described or Tested | Authors' Comments and Conclusions | Supports Conclusion that Subacute Exposure can Cause Chronic CNS or PNS Effects? |
|---|---|---|---|---|---|---|---|
| L. Atkinson et al., *Toxic Reaction to Inhaled Paint Fumes*, 65 Postgrad. Med. J. 559 (1989) | Uncontrolled case report | 65 year-old presented to hospital in acute confusional state, following one hour of exposure to polyurethane paint fumes in small, unventilated room. | Paint contained, 35 7% white spirit, an aliphatic hydro-carbon, and 0.9% xylene. | 1 hour | Transient bone marrow suppression and evidence of liver cell damage was observed, but "[t]he patient improved spontaneously over a 3 day period without any specific therapy." A follow-up examination one month later showed the patient to be healthy and to have normal liver and blood function | Authors attributed the effects to the *white spirit*, but cautioned that the "full range of symptoms cannot be explained on the basis of inhaling paint fumes alone." | No. Reports only acute intoxicating effects which resolved spontaneously with no residua. Note: Caravanos specifically cited this article as evidence that acute exposure to xylene at 500 ppm could cause the chronic PNS and CNS effects alleged by Mr. Amorgianos. (Caravanos Dep. at 163–64.) |
| M.A. Bakinson & R.D. Jones, *Gassings Due to Methylene Chloride, Xylene, Toluene, and Styrene Reported to Her Majesty's Factory Inspectorate 1961–80*, 42 Brit. Med. J. 184 (1985) | Summary of case reports | Not specified | Xylene | Not specified | See next column. | 38 cases of solvent poisoning attributed to xylene, including one death. The cases showed symptoms consistent with acute intoxication, and the one death was attributed to acute narcosis resulting in respiratory depression. | No. No chronic effects were reported, and no concentrations or durations were specified. |
| B.A. Olson, *Effects of Behavioral Performance of Workers in the Paint Industry*, 4 Neurobehavioral Toxicology & Teratology 703 (1980) | Cross-sectional study with reference group | 47 current workers with occupational exposure to organic solvents | Primarily xylene and toluene | Exposure in excess of TLVs for more than 10 years | See next column. | Exposed workers performed less well on battery tests than control group and reported a higher number of neurasthenic symptoms on their questionnaires | No. Finds symptoms consistent with acute intoxication in currently exposed workers with more than 10 years of chronic exposure. No conclusion as to permanence of the effects. |
| | Administered tests of simple reaction time, perceptual speed, short-term memory, and "critical flicker fusion" before and after a workday. Subjects also answered questionnaire regarding subjective symptoms. | | | | | | |
| R. Morley et al., *Xylene Poisoning: A Report on One Fatal Case and Two Cases of Recovery After Prolonged Unconsciousness*, 3 Brit. Med. J. 442 (1970) | *See* Table 2, *supra.* | | | | | | |
| Div. of Safety Research, U.S. Dep't of Health & Human Servs., *Painter Dies in a 140–Foot Fall at* | Uncontrolled case report. | 34 year-old male painter | Xylene | Not specified | Painter lost consciousness due to breathing xylene fumes and fell off a 140–foot water tower. | N/A | No. Since the worker died immediately because of the 140–foot fall, no conclusion can be drawn as |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| a Municipal Water Tower, September 22, 1988 Report No. FACE–89–5 (1989) | | | | | | | to what the long-term effects of the exposure on the painter would have been |
| S.D. McQuillan, Div. Of Surveillance, Hazards Evaluation & Tech Assistance Branch, NIOSH, U.S Dep't of Health, Educ. & Welfare, *Health Hazard Evaluation Report, Continental Columbus Corp., Columbus, WI*, Report No. HHE–78–102–677 (1980) | Report of government inspection of painting and curing operations at the titled work site. | N/A | See next column. | See next column. | Concentrations of benzene, chromium, coaltar-pitch-volatile, and hexamethylene-diisocyanate were found to exceed OSHA standards, while the concentrations of xylene and other solvents were found to be within OSHA limits. | The author concluded that the excess concentrations of former group of chemicals posed a serious health hazard to workers, but the evaluation did not report any illnesses. | No The report concludes with recommendations for better industrial hygiene measures, but provides no evidence on the health effects, acute or chronic, of xylene or any other solvent. |
| ACGIH, *Documentation of the Threshold Limit Values and Biological Exposure Indices* 1732–38 (ed. and date unknown) (chapter on xylene). | Summary of evidence supporting AGCIH's TLV for xylene | N/A | Xylene | N/A | N/A | The ACGIH documentation reports animal studies on the lethal dose and concentration of xylene, eye irritation, and carcinogenic and mutagenic effects. The only reference to neurological effects comes in the report of a study in which nine rats inhaled 690 ppm of mixed xylene, eight hours a day, six days a week, for 110 to 130 days and six rabbits inhaled 1200 ppm of xylene for eight hours a day, six days a week, for forty to fifty days. That study reported that "some" of the animals suffered paralysis of the hind legs.<br><br>Two other animal studies cited in the ACGIH documentation that involved exposures of similar concentrations and durations reported no significant pathological results: in one such study, rats, guinea pigs, monkeys, and dogs were continuously exposed to o-xy- | No. No information is given on the long-term effects of either acute or chronic xylene exposure on human CNS or PNS function. Nor, assuming that one can reliably extrapolate from effects on rats or rabbits to effects on humans, *see Joiner*, 522 U.S. at 144, 118 S.Ct. at 518, does the one study of rats and rabbits exposed to 690 and 1200 ppm xylene, respectively, support Caravanos's conclusion that a single day of exposure (or even Dr. Rutchik's estimate of four straight days with intermittent days of exposure over the preceding month, averaging three to five hours on each such day) at 500 to 2,000 ppm of xylene can cause permanent CNS or PNS damage in humans, since that study involved exposures that lasted for a much longer and more continuous period, viz., eight hours a day, six days a week for 110 to 130. or forty to fifty days, respectively. |

lene at 780 ppm for six weeks, or 78 ppm continuously for 90 days; in the other such study, rats and dogs were exposed to 810 ppm of mixed xylene for 13 weeks.

The human studies reported only include results on eye irritation and acute intoxicating effects.

**Table 4. Time records and daily reports.**

| Date | Triventure Time Records * | Romano–Ahearn & Dynamic Inspectors Daily Log ** | KTA–Tator Daily Painting Inspection Report *** |
|------|---------------------------|--------------------------------------------------|------------------------------------------------|
| | Number of Hours Mr. Amorgianos Worked | Comments Regarding Day's Activities | Comments Regarding Coating(s) Applied and Method(s) of Application<br><br>"AS" = airless sprayer<br>"B" = brush<br>"B & R" = brush and roller |
| 7/22/95 | 7 | – | No coating |
| 7/23/95 | 7 | – | No coating |
| 7/24/95 | 8 | – | No coating |
| 7/25/95 | 8 | – | Zinc Plate 49 with AS from 10am to 1pm |
| 7/26/95 | 8 | – | No coating |
| 7/27/95 | 0 | – | No coating |
| 7/28/95 | 0 | – | No coating |
| 7/29/95 | 7 | Blasting & Painting | Zinc Plate 49 with B; Epolon Mastic with AS & B from 11am to 2pm |
| 7/30/95 | 7 | Painting | Epolon Mastic with AS & B until 1:30pm |
| 7/31/95 | 8 | [Not specified] | Epolon Mastic with B & R; Zinc Plate 49 with AS & B from 1pm to 3:15pm |
| 8/1/95 | 8 | – | Epolon Mastic with B & R |
| 8/2/95 | 8 | [Not specified] | Epolon Mastic with B & R; Acrolon with B & R; Zinc Plate 49 with AS from 11am to 1pm |
| 8/3/95 | 0 | – | No coating |
| 8/4/95 | 0 | – | No coating |
| 8/5/95 | 7 | – | Epolon Mastic with B & R |
| 8/6/95 | 0 | – | No coating |
| 8/7/95 | 7 | – | Urethane with B & R |
| 8/8/95 | 7 | Everyone painting red | Urethane with B & R |
| 8/9/95 | 8 | Painting | Cool red urethane with AS |
| 8/10/95 | 0 | No work | No coating |
| 8/11/95 | 0 | – | Acrolon II cool red with B & R |
| 8/12/95 | 7 | – | Antigraffiti coat with B & R |
| 8/13/95 | 7 | [Not specified] | No coating |
| 8/14/95 | 3 | – | No coating |
| 8/15/95 | 8 | Mostly blasting | No coating |
| 8/16/95 | 8 | Blasting and cleaning | No coating |
| 8/17/95 | 7 | Blasting and cleaning | – |
| 8/18/95 | 7 | Zinc primer | Zinc Plate 49 & Reducer 145 with AS |
| 8/19/95 | 7 | Priming | Zinc Plate 49 & Reducer 145 with AS |
| 8/20/95 | 7 | Prime | Zinc Plate 49 & Reducer 145 with AS until 2pm |
| 8/21/95 | 8 | Touch up | Zinc Plate 49 with B & R; Epolon Mastic with AS; Red oxide with AS[illegible] |

| 8/22/95 | 8 | Mastic | Epolon Mastic with AS; Red oxide with AS [illegible] |
| 8/23/95 | 8 | – | No coating |
| 8/24/95 | 8 | Just blasting | No coating |
| 8/25/95 | 8 | – | Zinc Plate 49 with AS |
| 8/26/95 | 7 | 2 men spraying used about 100 gals of Mystic | Zinc Plate with AS; Epolon Mastic 81 with AS |
| 8/27/95 | 5 * | Cleaning + doing holidays only 3 men showed up | Epolon Mastic 81 with AS; No coating |
| 8/28/95 | 8 | Touch up + primed | Zinc Plate 49 with AS; Epolon Mastic 81 with AS |

\* Def.'s Letter Brief of 12/6/99, Ex. K.

\*\* *Id.,* Ex. L. "–" signifies that no report was filed on that date.

\*\*\* *Id.,* Ex. J.

\* Per Mr. Amorgianos's trial testimony. (Tr. 6/17/98, at 88.)